THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLARENCE M. LUCKETT, Defendant-Appellant.

First District (1st Division) No. 60336

Opinion filed April 25, 1977.

James J. Doherty, Public Defender, of Chicago (Richard D. Kharas, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Gary W. Adair, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a bench trial, Clarence M. Luckett (defendant) was found guilty of bribery (Ill. Rev. Stat. 1969, ch. 38, par. 33—1(d)), and was sentenced to probation for 4 years with 120 days of periodic weekend imprisonment. He has appealed, urging that the court erred in denying his motion to suppress a statement which he made while in custody and that the evidence failed to prove him guilty of bribery beyond a reasonable doubt.

The State's theory is that defendant, an officer of the Illinois Bureau of Investigation (IBI), accepted money from a person who had been an

informant in various narcotic cases. In return for this, defendant was to influence James Reilley, assistant State's Attorney, to act leniently in prosecuting this informant. The facts will be stated in a later portion of this opinion. Since the issue concerning the motion to suppress is, in our opinion, central to the issue of guilt, we will first summarize the proceedings with reference to said motion.

Prior to trial, defendant filed a written motion to suppress certain statements under a number of theories. Defendant's motion for new trial avers that the statements in question "were involuntary since they were elicited as a result of mental coercion." After a hearing, the trial court denied the motion to suppress. The parties by their counsel stipulated that no physical coercion was used by any agent of the IBI or of the State's Attorney's office against defendant while he was in custody. The State called two agents of the IBI and two assistant State's Attorneys. The parties have stipulated that defendant was arrested about 5:15 p.m. on October 29, 1971. The evidence shows that he remained in the custody of the IBI at their office in Chicago until about 2 o'clock the following morning when he was taken before the bond court and released on his individual bond.

Carroll Gibson, a special agent in charge of narcotics for the IBI, testified that he saw defendant in custody at the IBI headquarters in Chicago. In response to his inquiry, defendant told him that he had been advised of his rights. This was about 7 p.m. that evening; Gibson left the room and returned about 9 p.m. He did not notice anything unusual about defendant. He told defendant that he was suspending him from his position. He asked defendant about official equipment such as his badge, gun and credit cards. Defendant responded that he had some of this equipment at home. The witness then started to give defendant his *Miranda* warnings. At that time assistant State's Attorney James Reilley entered the room and completed the statement of rights to the defendant. Defendant was asked if he wished to make a phone call to his attorney but responded that he wished to call a lady friend. In response to an inquiry from the witness, defendant stated that he had no objection to monitoring of the telephone call by the witness. The defendant made the call and told his friend that he was in "big trouble down at the office" and that he wanted her immediately to go home and replace the telephone on the hook.

The witness then ascertained that defendant's gun and other items of official property were missing. Defendant informed him that they were at defendant's home and said he would have no objection if the witness went to get these items. A search warrant was obtained and defendant's residence was searched. At about 12:30 a.m. the witness returned. He did not notice anything unusual about defendant. Both the witness and

Reilley asked defendant some questions. At that time Reilley asked the witness if the IBI had any objection to permitting defendant his liberty on his own bond. Defendant told Reilley that he did not wish to be taken to jail and asked if he could be released on his own recognizance. Reilley told defendant that he would not object to this procedure if the IBI did not. The witness made a telephone call to his superior who told him that the IBI had no objection to defendant's release on his own bond.

Terry Sullivan, an assistant State's Attorney, testified that he came to the IBI office about 8 o'clock that evening with James Reilley. The witness and Reilley first conferred with Officer Gibson. After about an hour all three of them went to see defendant. Gibson and Reilley both advised defendant of his rights although defendant had told them that this was unnecessary as he understood his rights. The witness went to defendant's home along with officers of the IBI. They returned at about 1 a.m. Regarding the interrogation, the witness testified that defendant first denied his guilt. After he returned from the search of defendant's home, Reilley again asked defendant if he wanted to·tell the truth. Defendant stated, "yes" and then responded affirmatively to questions by Reilley as to whether he took a $420 bribe on October 29, 1971, in the Hub Restaurant from Wallace Davis to fix a case in narcotics court. The witness further testified that defendant then asked Reilley if he could be released on his own bond. Reilley responded that he did not wish defendant to make the statement he did just to be released from custody. Reilley added that this matter was up to the judge in bond court and repeated to defendant that he did not wish the defendant to make a statement because he was tired, wanted to be promised something or was hungry. Reilley asked defendant if his statement was the truth and whether it actually happened that way and defendant responded affirmatively.

Assistant State's Attorney James Reilley testified that he had known defendant previous to the arrest. Both the witness and Officer Gibson advised defendant concerning his *Miranda* rights although defendant stated that he understood his rights. The witness corroborated the conversation regarding the phone call by defendant to his lady friend and the return of State property. The witness, defendant and others present were supplied with hamburgers, doughnuts and coffee.

The witness testified in detail that, shortly after the return of the officers who had executed the search warrant, he asked defendant if he wished to tell the truth and after further conversation defendant responded affirmatively to his questions concerning whether the defendant took a bribe of $420 from Wallace Davis in order to fix a case. Defendant then asked the witness if he was going to be released on his own bond. The witness responded that, after conversations with officers of the IBI, he

would recommend that the judge in bond court follow this procedure but that he could not tell defendant whether or not the judge would do it.

The witness testified that defendant further told him in response to questions that defendant was telling the truth and did not make his statement because he was hungry or tired. In response to further questions concerning the money, defendant stated that he threw the money away in the street. Defendant then told him that he would be willing to sign a written statement and that he would give him a statement before a court reporter on the following Monday, November 1, 1971. Defendant was then taken before the bond court.

The last witness for the State was Russell Cerceo, an agent for the IBI. He was present at the interrogation commencing about 10 p.m. He left shortly but returned about 10:30 and remained until about 1 a.m. He then left the room again but returned about 1:15 a.m. He testified that no tape recorder was operating and that the conversations with defendant were not taken in shorthand. Between 1:20 and 1:25 a.m., he heard the conversation concerning release of defendant on his own bond initiated by Reilley. Reilley told defendant that he would probably be released on his own bond provided that the judge accepted the request to that effect. Also, Reilley asked defendant if he would make a written statement on the following Monday concerning what he had said.

Defendant was a Chicago police officer for about 1 year. In 1969, he became a narcotics investigator for the IBI. On the motion to suppress, he testified that he was arrested and taken to the IBI offices with which he was familiar. He was searched several times and a comment was made that "the money" could not be found. Wallace Davis, the informer, was called into the room at one time and the officers showed defendant a microphone strapped to Davis' back. Reilley did not completely inform defendant of his constitutional rights but started and then stopped. Defendant testified to his return of official property and the fact that he gave the officers the key to his bureau office. He then asked if he could make a telephone call to his lawyer. Reilley asked who the lawyer was. Defendant responded that he did not know but that he would get the telephone number from his friend. Reilley refused to permit him to call his friend.

Reilley talked to the defendant and said that he could help defendant to avoid the "tough tactics" of another State's Attorney. Reilley then told defendant that if defendant did not tell him what he did with the money, Reilley would see that he went to the County Jail that night. Reilley told him, in effect, that the IBI could not obtain defendant's release on his own recognizance without the State's Attorney. Defendant testified that he did not wish to go to the County Jail that night because persons he had arrested were confined there.

Defendant also requested several times that money found upon his person at the time of his arrest be returned. He also asked if he could call his friend to obtain a telephone number for a lawyer. The response was that he could do so only if the officers were permitted to listen. Defendant corroborated previous testimony regarding the making of the monitored call. Defendant further testified that Reilley then told Officer Gibson that, even though the IBI would agree to defendant's release on his own bond, he would request the court to fix a cash bond concerning possession of marijuana. Apparently some of this substance had been found by the officers at defendant's home. Reilley repeated that if defendant did not tell him what he wished to know, he would request a cash bond. Gibson and Reilley then both left the room.

Reilley returned after about 45 minutes or an hour and again told him that he was going to set a cash bond on the marijuana and that defendant was going to the County Jail unless he told Reilley what he wanted to know. Defendant then asked, "What do you want to know?" Reilley responded that he wished to know about the money and defendant stated that he threw the money in the alley. Reilley then asked if defendant did take the money and defendant shouted in a loud voice, "Yes." Reilley asked defendant if he would give the statement before a court reporter on Monday and defendant agreed and stated, "I will do anything you say, let me out of here."

Defendant testified that Reilley never gave him his rights and that Officer Gibson had only started to advise him about his rights. About 2 a.m. defendant appeared in bond court and the court admitted him to bail on his personal recognizance. At the close of this evidence, the trial court denied defendant's motion to suppress his statement.

■■■ The constitutional protection of every citizen against official interrogation by physical coercion or by more subtle means is of prime and urgent importance. The defendant's claim that his confession was involuntary thus raises a serious issue which requires most careful consideration. We are obliged to decide this question upon the basis of "the totality of the circumstances." (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied*, 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) We are mandated to give consideration to " 'both the characteristics of the accused and the details of the interrogation.' " *People v. Simmons* (1975), 60 Ill. 2d 173, 179, 326 N.E.2d 383, quoting *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 93 S. Ct. 2041.

■■ In the type of pretrial hearing before us, "[t]he burden of going forward with the evidence and the burden of proving that a confession was voluntary * * *" rests upon the State. (Ill. Rev. Stat. 1975, ch. 38, par. 114—11(d). See also *People v. McClure* (1976), 43 Ill. App. 3d 1059, 1061,

358 N.E.2d 23, citing *Lego v. Twomey* (1972), 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619.) However, in deciding the issue regarding the voluntary nature of a confession, "the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence." (*Prim*, 53 Ill. 2d 62, 70. See also *People v. Pittman* (1973), 55 Ill. 2d 39, 52, 302 N.E.2d 7.) The quantum of proof required of the State has been aptly termed "one of persuasion and not beyond a reasonable doubt." Ill. Ann. Stat., ch. 38, par. 114—11, Committee Comments, at 215 (Smith-Hurd 1970).

■■ In the case before us there is neither claim nor evidence of physical coercion. The parties have stipulated that this did not exist. Defendant had been a police officer and then a narcotics investigator for a number of years. The interrogation took place in the building which housed the offices of the IBI with which defendant was associated. The gist of defendant's evidence is that subtle compulsion was exercised against him by means of the threat that it would be necessary for him to spend some time in the County Jail which housed persons in whose incarceration defendant had been instrumental. Defendant's version of the incident is entirely uncorroborated and it is flatly contradicted by the testimony of two agents of the IBI and two assistant State's Attorneys. A careful reading of the record convinces us that the result reached by the trial court was supported in most convincing manner by the manifest weight of the evidence. Defendant's confession was therefore competent evidence against him.

Comment upon two decisions may be helpful here. In *People v. Koesterer* (1976), 44 Ill. App. 3d 468, 358 N.E.2d 295, defendant was 20 years old; she was a habitual user of controlled substances and there was evidence that she had used drugs shortly before her arrest. Her parents joined with the police in urging her to make the assailed statement because of a promise by the State's Attorney that she would be granted liberty on a recognizance bond preliminary to enrolling in a drug rehabilitation program in California.

In *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50, cited in *Koesterer,* defendant testified that the police induced the confession by showing him the statute book including penalties for various offenses and by promising him that if he confessed to everything he would only be charged with some of these offenses and that they would help him get released on a recognizance bond. This court held that the police officers actually persuaded defendant that "if he made a statement he would be treated more leniently." (32 Ill. App. 3d 765, 771.) Defendant was a high school student, 18 years old. A captain of the police department who was defendant's uncle assisted in the interrogation. Under these

circumstances, this court affirmed a determination by the trial court that the State had failed to prove the voluntary character of the confession.

These decisions are not persuasive authority in the case before us. As shown, the evidence here is most convincing to the effect that defendant made his statement prior to the discussion concerning the question of release upon his individual bond.

The competency of defendant's confession will appear more clearly after consideration of all of the evidence heard by the trial court. It must be stated at the outset that the admitted facts present a situation strongly reminiscent of a comic opera.

During defendant's service he had occasion to know a man named Wallace Davis. Davis had a long criminal record going back to 1948. Davis testified that he had been a user of heroin since he was 15 years old. He has been convicted of several crimes, including theft. During the times material here, he was a defendant in two criminal cases, both of which involved sale of heroin. Defendant was the complaining witness in one of these cases. Davis testified that he was no longer a user of heroin. He had entered the Illinois Drug Abuse Program in 1971 and had been using methadone in lieu of heroin. He was still in contact with the Drug Abuse Program at the time he testified.

Davis testified that during September of 1971, he had a conversation with defendant in the courthouse corridor. Defendant offered him a substantial amount of money for his help in securing information that would enable defendant to arrest certain persons. Davis testified that he reported this conversation to assistant State's Attorney Reilley. He also told Reilley that defendant had exposed Davis' work as an informer to other people. Sometime later, Davis was summoned to Reilley's office. There, in the presence of Reilley and two agents of the IBI, Davis again voiced his suspicion of defendant. Subsequently, Reilley asked Davis if he could produce evidence to substantiate his charges.

Davis testified that he then had another conversation with defendant in which defendant requested money in return for his promise not to press the charges against Davis and also to influence Reilley to obtain the same result. Davis testified that defendant mentioned the sum of $5000 and he, Davis, suggested $2000 and requested that this be paid in installments. After further conversation he and defendant agreed to meet the next day, October 29, 1971, at the Hub Restaurant. At that point Reilley approached and the conversation ceased. Reilley spoke to defendant who stated that he would not object to another continuance to the case against Davis. Defendant had previously protested such continuances.

After the court appearance Davis told Reilley of the additional conversation. Reilley gave Davis instructions for the working out of a plan whereby the alleged bribe could be intercepted. With due cloak and

dagger secrecy, Davis received telephone instructions early the next morning to report to a bus station drug store in downtown Chicago. The caller asked Davis to describe the clothing he would be wearing so that he could be identified by the persons who were to meet him. Davis complied with these instructions and was taken from the drug store rendezvous point to the State's Attorney's office. He was stripped and searched. A radio transmitter was attached to his back. Davis himself did not know how to operate this apparatus. Davis was then given $500 in marked money of which the serial numbers had been registered. He then had no other money in his possession. About 3 o'clock that afternoon, Davis was driven by a Chicago police officer, Edgar Buck, to the vicinity of the restaurant. Buck activated the transmitter. Then Davis, followed by Buck, entered the restaurant.

Shortly thereafter Davis saw defendant approaching the area of the restaurant. Davis walked outside the door to attract defendant's attention. He spent some 30 seconds or a minute in conversation with two acquaintances who asked him a drug-related question. Defendant approached and indicated by a motion of his head that Davis follow him into the restaurant. The defendant sat on a stool at the counter. Davis took a seat on the right side of defendant. Next on the right was an unknown patron of the restaurant and, still farther, at the next seat to the right, was Officer Buck wearing a disguise. While this was proceeding an official van with radio and other capabilities was placed across the street from the restaurant so as to permit its occupants to view the entrance. One police officer was stationed at a nearby elevated station. Other officials were sitting in a taxicab in the close vicinity.

In the restaurant defendant ordered pie and coffee and then asked the waitress for a paper bag. Davis testified that defendant then handed the bag to him and stated, "Here put the money in there." Davis then requested that the defendant permit him to retain $80 and accept $420 as the first installment. Davis told defendant that this was for payment of bills and for family reasons so that his people would not think that he had used the money for narcotics. The idea of the reduction of the first payment had been agreed upon in advance by Davis and the officers. Davis testified that defendant turned to him and said, "You know it is supposed to be five." Buck testified that this precise language was used by defendant. Davis and defendant then agreed to the reduced payment and Davis promised that he would pay defendant the balance of the money on the following Saturday. During this conversation all of the electronic surveillance equipment malfunctioned and only Officer Buck was able to overhear any of the words spoken between Davis and defendant.

Davis then walked out of the restaurant and gave a signal to the officers by removing his glasses and wiping his forehead. He then crossed the

street and walked away, making certain that Officer Buck was always able to see him. Davis was watched at all times by the officers and was taken to the IBI office by the officials in the taxicab. He was searched immediately upon entering the cab and $80 in registered money was recovered from his person. He gave a sworn statement before a court reporter embodying the substance of his testimony.

In approximately 1½ minutes defendant followed Davis out of the restaurant. He was under police scrutiny. He walked a few feet down the street into an alley. He soon emerged, walked down the street again, entered a currency exchange for a short time and left. He walked to a different alley and then again reentered the same currency exchange. He drove to a telephone company office where he met a young lady and drove her home. After she left defendant's car, the officers took defendant into custody.

Search disclosed that defendant had $420 in his pocket but this currency was not the registered money. Defendant was taken to the IBI offices and his interrogation followed as above discussed. The authorities made a search of the streets and alleys around the restaurant, the currency exchange and all other places which defendant had visited while under their surveillance prior to arrest, but the money could not be found. There is evidence that a woman employee of the currency exchange knew the defendant. Upon being questioned regarding this episode, defendant stated that he had entered the currency exchange for the purpose of obtaining some rolls of quarters for use in a slot machine investigation.

Defendant testified that he ate quite often at the Hub Restaurant. On the day before defendant's arrest, he saw Davis who pleaded for a continuance in connection with a court appearance. Defendant also had a general conversation with Reilley. At Davis' request, defendant then agreed to meet with Davis the next day at 4:30 or 5 o'clock at the Hub Restaurant. When he arrived there, he saw Davis standing in front of the restaurant speaking to a man named Willie Bows, a defendant in another case who had been charged with selling methadone. He also saw a police officer named Sergeant Williams in the area. Defendant then walked into the restaurant with Davis behind him. Davis sat down next to him at the counter. Defendant asked the waitress for two cups of coffee and then for potato pie and a bag. It was his custom to get several slices of potato pie at the restaurant, eat one or two and take one home in a bag. He spoke to Davis about whether the latter was using narcotics and received a negative answer. Davis asked him why he was late. He replied that they had agreed to meet at 5 o'clock. Davis then got up and left the restaurant.

Defendant paid the check and then recognized Officer Edgar Buck seated at the counter. When he came to the door, he did not see Davis. He walked down the alley and could not find him. He then came out and

looked down another alley, also without seeing Davis. He denied that he entered the currency exchange at that time. He then searched again down the alley adjacent to the currency exchange and could not find Davis. He went into the currency exchange and obtained two rolls of quarters.

Defendant entered his car and drove to the telephone company where he sought to have his telephone service checked. About that time his home telephone was not working well. By chance, he met a young lady who lived in the same building as his lady friend. He offered her a ride to her home and she accepted. He noticed then that police officers were following him. After a time he let the girl out of his car and he was subsequently stopped and arrested. He testified that at the time of his arrest, he had $453 or $460 in currency and some change in his pocket. The rolls of quarters were in the glove compartment of his car. He testified in detail that $336 of the money in his pocket was official funds for his use and the balance was from his paycheck. We have already summarized the occurrences at the IBI headquarters and the verbal confession given by defendant to the police and assistant State's Attorney.

Defendant presents his argument on the strength of the testimony in three subdivisions. First, he contends that the prosecution failed to prove a corrupt intent of defendant to influence assistant State's Attorney Reilley in the performance of an official act; second, the prosecution failed to prove that the prerecorded State funds were received by defendant; and third, there is a reasonable probability that Davis converted to his own use the money with registered serial numbers.

■■ In our opinion, if the testimony of Wallace Davis is to be believed, the guilt of defendant beyond reasonable doubt must necessarily follow. It is undisputed that Davis was at one time a narcotics addict. The reviewing courts of Illinois have considered this type of evidence in a number of cases. The question of credibility does not exist only when the witness is under the influence of narcotics at the time of testifying. The courts have recognized that narcotic addiction may have an adverse effect "on the ability to observe, accurately reflect and retain what was observed, and the general power and inclination towards truthfulness * * *." (*People v. Galloway* (1974), 59 Ill. 2d 158, 163, 319 N.E.2d 498.) For these reasons it has been repeatedly held that there is a "need for close scrutiny in those cases where the State's case rests upon the credibility of a narcotics addict." *Galloway*, 59 Ill. 2d 158, 163.

■■ In the case before us, the witness had not used drugs at the time he observed the subject of his testimony or at the time he testified; nor was he an addict during the entire period of time. Therefore, the rule which should be applied here is that the fact of the witness' previous addiction bears upon his credibility but, "it does not follow that his testimony must

necessarily be disbelieved, especially when corroborated by other witnesses." *People v. Smith* (1968), 41 Ill. 2d 158, 161, 242 N.E.2d 198. See also *People v. Hubbard* (1972), 4 Ill. App. 3d 729, 732, 281 N.E.2d 767, *aff'd*, 54 Ill. 2d 546, 301 N.E.2d 290 (1973).

In the case before us, we have an issue of credibility raised by the direct conflict between the testimony of Davis and defendant. However, the testimony of Davis is corroborated by a number of circumstances such as the amount of registered money which he had in his pocket after he left the restaurant and the testimony of Officer Edgar Buck who was seated only a short distance away from defendant and Davis at the time of their conversation. It is true that proper and reasonably careful investigative work would have made the State's case easier to prove. If the microphone device fastened to Davis or the recording apparatus in the van had functioned properly, a completely different situation would have been presented. But, this goes only to the degree of corroboration of the testimony of Davis and cannot change the fact that corroboration did exist.

The important factor which must next be considered is the existence of the defendant's own confession. We have already expressed the opinion that the voluntary nature of the confession was proved by clear and convincing evidence. In the same degree, the defendant's own confession serves to strengthen and corroborate the testimony of Davis. It need hardly be repeated that defendant's confession is supported and strengthened by the testimony of assistant State's Attorney Reilley and Officer Buck. In our opinion, therefore, the case here resolves itself into a question of credibility as to whether the trial court should have believed the strongly corroborated testimony of Davis presented with the defendant's own confession or the unsupported testimony of defendant himself. We must apply the time-honored principle that "it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. [Citations.] Where the evidence is merely conflicting a court of review will not substitute its judgment for that of the trier of fact." *People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.

■■ This analysis convinces us that *People v. Dawson* (1961), 22 Ill. 2d 260, 174 N.E.2d 817, cited by defendant, cannot assist him here. In *Dawson*, the supreme court found the evidence produced by the State to be "improbable, unconvincing and contrary to human experience * * *." (22 Ill. 2d 260, 265.) Similarly, in *People v. Gokey* (1974), 57 Ill. 2d 433, 312 N.E.2d 637, the supreme court reversed a conviction for bribery. The testimony was that defendant offered a bribe of $50 and then in his conversation quickly raised the amount to $5000 and then to $7200 which

he openly took from his pocket and tossed upon the table. The supreme court described this tirade by defendant as probably having been " * * * language of anger and exasperation, or of bravado or language prompted by alcohol or by some medical cause, but, considering the circumstances, it was hardly language seriously proposing criminal conduct." *Gokey*, 57 Ill. 2d 433, 439.

In our opinion, it is unnecessary to consider the detailed factual arguments made in the lengthy briefs presented by able counsel on both sides. This record impels us to conclude that the guilt of defendant has been proved beyond reasonable doubt and the judgment is accordingly affirmed.

Judgment affirmed.

McGLOON and BUA, JJ., concur.