(No. 48972.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. WALTER WASHINGTON, JR., Appellee.

*Opinion filed October 5, 1977.*

MORAN, J., took no part.
UNDERWOOD and RYAN, JJ., dissenting.

William J. Scott, Attorney General, of Springfield, and Philip G. Reinhard, State's Attorney, of Rockford (James B. Zagel, of Chicago, and Jayne A. Carr and Gerri Papushkewych, of Springfield, and Phyllis J. Perko and

Christine M. Drucker, of the Illinois State's Attorneys Association Statewide Appellate Assistance Service, of Elgin, of counsel), for the People.

Ralph Ruebner, Deputy Defender, and Peter B. Nolte, Assistant Defender, of the Office of State Appellate Defender, of Elgin, for appellee.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

In a jury trial in the circuit court of Winnebago County, defendant, Walter Washington, Jr., was convicted of the offenses of murder and armed robbery. The appellate court reversed and remanded (41 Ill. App. 3d 475), and we granted the People's petition for leave to appeal. The facts are adequately stated in the appellate court opinion and will be repeated here only to the extent necessary to discuss the issues.

On March 22, 1974, shortly before 9 p.m., the Pacemaker Grocery Store in Rockford was robbed by an armed man wearing a woman's plaid cape with a hood, and a ski mask over his face. The robber left the store pursued by the owner and two stock boys, one of whom was shot to death. The other boy saw the robber jump over a fence and run down an alley. Shortly thereafter the police arrived at the scene, and one of the officers followed, in the fresh-fallen snow, a single set of tracks which led from the dead boy's body to a garage. Police officers surrounded the garage and upon entering found the defendant crouched in a corner. A revolver and $1,270 in cash were found nearby. The plaid cape, abandoned in the store by the robber, the ski mask, and a pair of black trousers which were found a short distance from the garage in which defendant was hiding, were examined in the laboratory of the Federal Bureau of Investigation. Fibers recovered from the cape and from the black trousers

showed the same microscopic and chemical properties as the sweater and white trousers worn by defendant when he was arrested. A firearms examiner employed in the Federal Bureau of Investigation's laboratory testified that the fatal bullet was fired from the revolver found when defendant was arrested.

Defendant was taken into custody at approximately 9 p.m. and advised of his rights. En route to the police station he told the police officers that he had been with another person. Upon arrival at the station defendant was given a "waiver of rights" form which he read aloud and signed with a fictitious name. He then told the police that he had been at the Bee Hive Club with a man named Jerry Wilson, and had left there with Wilson in a 1964 or 1965 Mercury. Wilson parked the car and told defendant that he was going to see a friend. Approximately 15 minutes later, defendant left the car and started walking down the street when Wilson returned and handed him a gun and a large amount of money. When defendant saw police cars in the area he jumped a fence and ran into a garage. Shortly thereafter he repeated this story, with slight variations, to two other detectives. After he had been placed in a lineup, photographed and given a neutron activation test, he told the detectives that he did not want to talk anymore. He declined the opportunity to make a telephone call, and at approximately 1 a.m. was placed in a cell.

At 9:30 a.m. Detectives Bland and Fagin resumed the interrogation. Defendant was advised of his rights, signed a rights waiver form and, although he said that he was willing to talk, stated that he wanted a public defender. Detective Bland testified that "We stated we could not give it to him, that it would have to be determined by the Court whether he could have a Public Defender." Officer Fagin gave him the name of the public defender and a telephone directory. His attempt to reach the public defender by telephone was unsuccessful. Defendant was

questioned intermittently until approximately 1:10 p.m., when he again attempted, unsuccessfully, to reach the public defender by telephone. He was returned to his cell, and there is no evidence of further questioning until approximately 5:30 p.m. No attempt was made to introduce into evidence any of the statements made by defendant during the period from 9:30 a.m. to 1:10 p.m.

At approximately 5:30 p.m. Detectives Cronk and Gessner were told that defendant "wanted to talk to some detectives." Defendant was brought to an office on the second floor of the detective bureau and warned of his rights. He said that he understood, and signed the waiver of rights form. Defendant told the detectives that he did not wish to make a statement but wanted to speak to a priest and a psychiatrist. He was told that they could probably get a priest for him that evening but he would not be able to see a psychiatrist until he was taken to the county jail. Defendant was permitted to call his mother by telephone and spoke with her. He was then asked by Detective Gessner how he felt and replied that he "felt real bad about the dead boy, his family, and also his own family." In response to further questions he stated that he was alone that night and that he wanted to talk but wanted more time to think about it.

At approximately 8 p.m. defendant was brought from his cell in order to talk to Father Wentig, the police chaplain. Following his conversation with Father Wentig, defendant again talked with the police officers, who asked him if it was necessary to advise him of his rights. He told them that he understood them. In response to Detective Gessner's question he stated that he had been involved in one other robbery, that he got nothing out of the first robbery, and that was the reason that he "pulled the second one." He stated that he told the officers about it "because he did not want an innocent person to go to jail."

In reversing the judgment the appellate court held that defendant's right to cut off questioning was not "scrupulously honored," that the statements made after he requested an attorney should have been suppressed, and that the erroneous admission into evidence of those statements required reversal of the judgment and remandment of the cause for a new trial. The People contend that the appellate court erred in reversing the judgment for the reason that the defendant had knowingly waived his rights prior to making the statements, and that, assuming that the statements were erroneously admitted, the error was harmless. It is defendant's position that the statements made during the interrogation following the request for counsel were inadmissible and that the judgment was properly reversed.

In *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court said: "If *** [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." (384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612.) "[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege ***." (384 U.S. 436, 469, 16 L. Ed. 2d 694, 721, 86 S. Ct. 1602, 1625.) "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. *** If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.) "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S.

Ct. 1602, 1628.

In their brief the People state correctly that "the instant case involves the right to counsel, as distinguished from the right to remain silent." The distinction, and its significance, is elucidated by the opinion in *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, relied upon by the People in arguing that defendant knowingly waived his right to counsel, wherein the Supreme Court said:

"7. The present case does not involve the procedures to be followed if the person in custody asks to consult with a lawyer, since Mosley made no such request at any time. Those procedures are detailed in the *Miranda* opinion as follows: 'If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to the police, they must respect his decision to remain silent.

This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as

they do not question him during that time.' [384 U.S. 436, 474, 16 L. Ed. 2d 694, 723-24, 86 S. Ct. 1602, 1608.]" 423 U.S. 96, 101 n.7, 46 L. Ed. 2d 313, 320 n.7, 96 S. Ct. 321, 325 n.7.

"10. The dissenting opinion asserts that *Miranda* established a requirement that once a person has indicated a desire to remain silent, questioning may be resumed only when counsel is present. *Post,* at 116-117. But clearly the Court in *Miranda* imposed no such requirement, for it distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.' [384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.]" 423 U.S. 96, 104 n.10, 46 L. Ed. 2d 313, 321 n.10, 96 S. Ct. 321, 326 n.10.

"2. The question of the proper procedure following expression by an individual of his desire to consult counsel is not presented in this case. It is sufficient to note that the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." 423 U.S. 96, 110 n.2, 46 L. Ed. 2d 313, 325 n.2, 96 S. Ct.

321, 329 n.2 (White, J., concurring).

Although we agree with the People that the right to counsel may be waived (*People v. Morgan* 67 Ill. 2d 1), we conclude that the People did not meet the "heavy burden *** to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained counsel." (*Miranda v. Arizona,* 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.) His requests for an opportunity to speak with a priest and a psychiatrist cannot be construed to be such waiver, nor did his conversation with Father Wentig authorize the resumption of interrogation. The circuit court erred in admitting the statements made after 5:30 p.m.

We consider next the People's contention that the admission into evidence of the statements was harmless error. The record shows that two of the employees of the Pacemaker Grocery Store were unable to identify the defendant at a lineup and testimony adduced at the trial appears to corroborate defendant's story that another individual was present at the time. Under these circumstances we find apposite the court's observation in *People v. Henenberg,* 55 Ill. 2d 5, 12: "We have carefully reviewed the evidence, and without deciding whether the admission into evidence of a [statement] obtained in violation of *Miranda* can ever be harmless error, we have concluded that the admission of testimony concerning the defendant's [statements] was not harmless beyond a reasonable doubt. (See, *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.)"

For the reasons stated the judgment is affirmed.

*Judgment affirmed.*

MR. JUSTICE MORAN took no part in the consideration or decision of this case.

MR. JUSTICE UNDERWOOD, dissenting:

I am not at all certain that the circumstances here even involve a *Miranda* violation (*People v. Morgan,* 67 Ill. 2d 1), for it was defendant, not the officers, who initiated the conversation the evening following his arrest by indicating he wanted to talk to the officers. He signed the waiver of rights form and asked to talk to a priest and psychiatrist. After being told a priest would be there that evening but that he would have to wait until he was at the county jail to see a psychiatrist, he called his mother and talked to her. When asked how he felt, he answered that he felt "real bad" about the dead boy, his family and defendant's own family. He later indicated he wanted to talk but needed more time to think about it, and the statements which the majority holds improperly admitted were made later that night following defendant's conversation with the police chaplain. But even assuming that a violation did occur, it is entirely clear to me that any error in admitting defendant's statements into evidence was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

The evidence of defendant's guilt is overwhelming. It is undisputed that shortly before the robbery, defendant parked his girl friend's car in front of Clarence Peterson's house near the Pacemaker store. Peterson saw a young man get out of the car, remove a small object from the trunk, put a hood over his head, throw something onto the front seat of the car, and walk towards the Pacemaker store.

The woman's plaid cape worn by the robber was found outside the store. Fibers on this cape had the same microscopic and chemical properties as the fibers from the white sweater defendant was wearing when arrested. A ski mask and dark pants were found discarded between the

store and the garage where the murder occurred. The pants were turned inside out. Fibers on these pants matched, in all respects, fibers from the pants defendant was wearing when arrested.

Michael Cook and Henry Gregg were the two stock boys who followed the robber's footprints in the fresh snow to a garage at 1919 South Fourth Street. Gregg was shot in the head as he approached the garage. Cook ran across the street and sought help. On returning to the murder scene, he saw a man in the backyard. This man ran when he saw Cook, jumping over a wire fence into an alley. He then pointed a gun at Cook, who ducked behind the garage. Cook saw him run south down the alley. Police officers, who arrived about 30 seconds after Gregg had been shot, followed a single set of footprints from the body through the alley and up to a partially opened garage door. No other footprints were in the area. Defendant was found crouching in the garage. The murder weapon and robbery proceeds were found beside him. It is undisputed that defendant is the man Cook saw fleeing from the murder scene and that he had the gun and the money, although defendant does deny pointing the gun at Cook.

The theory of the defense is that Jerry Wilson, to whom defendant had given money to buy drugs, committed the crimes, gave defendant the gun and robbery proceeds, and fled. But defendant has given three different versions of this theory containing major inconsistencies. First he told the police he had arrived in the area in Wilson's car with Wilson. Wilson, according to defendant, left the car and returned in 15 minutes, handing defendant the gun and money. Defendant got scared and ran behind some houses into an alley, ultimately hiding in the garage. When the police pointed out that this meant he had the gun before the murder was committed, defendant changed his story. He then admitted driving his girl friend's car to the area and said Wilson ran with him into the garage

where he was found and gave him the gun there, but Wilson left before the police arrived. When informed only one set of footprints was found near the garage, he changed this story. All of the foregoing statements preceded the alleged *Miranda* violation.

Defendant testified at trial that he saw two boys following Wilson, so he circled a house and eventually met Wilson behind a house. Wilson said he had robbed the boys, gave defendant the gun and money, and ran. Defendant went towards the alley to head back toward his car and while doing so ran by Gregg's body. His testimony is inconsistent as to whether he saw the body once or twice.

The State's evidence in this case, including that concerning the matching fibers found on the robber's cape and on the discarded trousers, is well-nigh conclusive. In contrast, defendant's testimony is inconsistent with his earlier statements, contradicted in part by other testimony, and, it seems to me, simply devoid of probative value. If the circumstances which the majority holds constitute a *Miranda* violation are in fact a violation, which I doubt, they could not have prejudiced a defendant whose guilt has been so clearly established.

I would reverse the appellate court and affirm the judgment of the circuit court of Winnebago County.

MR. JUSTICE RYAN joins in this dissent.