THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BOBBY STONE, Defendant-Appellant.

Fifth District   No. 76-495

Opinion filed June 7, 1978.

Michael J. Rosborough and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Walden E. Morris, State's Attorney, of Harrisburg (Bruce D. Irish and Keith P. Vanden Dooren, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Defendant, Bobby Stone, appeals from a judgment of the circuit court of Saline County entered upon a jury verdict finding him guilty of committing indecent liberties with a child. The defendant was subsequently sentenced to a penitentiary term of from 4 to 12 years.

The defendant contends on appeal that a statement given by him to the police on February 12, 1976, was coerced and as such should not have been admitted into evidence, that the defendant was deprived of his right to an impartial jury when the court refused to excuse incompetent jurors for cause, that the court erred in refusing certain of the defendant's instructions and that in any case the conviction should be reduced to the offense of contributing to the sexual delinquency of a child.

The events giving rise to the offense in this case began the morning of February 10, 1976, when two young girls, the complaining witness Taresa Dzuris, age 14½, and Wilma Courtney, age 13½, ran away from their respective homes in Morganfield, Kentucky. The girls departed Morganfield about 8 o'clock that morning and hitchhiked with a male motorist to Harrisburg where they arrived at midmorning. After roaming around for a while, the girls went to the city park where Wilma became ill and vomited. The complaining witness stated that she then proceeded to a nearby house where she requested a washcloth from the woman who answered the door. Before leaving the park, the girls met a carload of boys who were on their lunch break and who invited the girls to go for a ride with them. Taresa and Wilma voluntarily joined the boys and remained with them for somewhat less than an hour. The boys promised to return for the girls after work; however, when they had not arrived by 6:30 that evening, Taresa and Wilma walked to a nearby pool hall. Taresa denied having drunk any liquor but admitted that her companion had.

Once inside the pool hall the girls met Carl Coseboon, age 20, and asked him for a place to spend the night. The three of them walked to Carl's mother's apartment where they were joined by the defendant, Bobby Stone, age 17. Carl explained the situation and asked Bobby if he knew where the girls could stay. Bobby allegedly volunteered his garage whereupon the four spent the night there, sleeping on the same bed. Dzuris stated that sometime during the night she and the defendant had sexual intercourse. From Wilma Courtney's statement to the police it appears that she and Carl Coseboon also had sexual intercourse that evening.

Taresa Dzuris testified that she wanted to appear older than her true age and in furtherance of that goal actually did tell the defendant she would be 16 in a few months. On direct examination Taresa stated that she had no money and that she engaged in sexual intercourse with the defendant because if she did not, she felt she would have no place to stay.

She later stated that she and Wilma spent the night in defendant's garage because that is where they wished to stay. During their stay together the defendant provided sodas and sandwiches for the girls.

The next day the group sojourned to a barn on a cliff out of town where they remained until several boys arrived to inform the defendant that his father was angry with him and that he should return home. The complaining witness stated that defendant and Carl had planned to take the girls back to Morganfield, but as they walked into town they saw Carl's mother sitting in a car across from the police station. It appears that Mrs. Coseboon was instrumental in persuading the girls to subsequently turn themselves over to the authorities.

During the evening of February 11, 1976, Taresa and Wilma, accompanied by Mrs. Coseboon, appeared at the police station in Harrisburg. As the police had earlier received a phone call from the parents of one of the girls, they promptly notified the parents of her presence at the station. After the parents' arrival Taresa admitted to her mother that she had engaged in sexual intercourse the previous night. The girls were immediately transported to the hospital where Dr. Derl D. Warren examined them for evidence of coitus. At trial Dr. Warren testified that his examination of the complaining witness around 10:30 p.m. on February 11, 1976, confirmed the presence of spermatazoa. Shortly before midnight Taresa and her companion made written statements to the police concerning the events of the previous night.

On the basis the above-detailed investigation police officer Kenneth Childers ordered two other officers to arrest the defendant. He specifically instructed them not to ask defendant any questions since he intended to interrogate him later. The defendant was subsequently arrested and read the Miranda warnings. At the suppression hearing defendant testified that Officer Pelhank and Officer Murphy asked him some questions concerning Coseboon's whereabouts while en route to the Saline County jail. Defendant alleges that at that time he informed the officers he did not wish to discuss the matter. According to defendant the officers then attempted to trick him into talking by asking him why Carl's sister was crying when they apprehended Carl. When the defendant again refused to discuss the matter, he was searched and left alone in the cell where he promptly went to sleep.

At 3:20 a.m. defendant was awakened and transferred to the booking room where Officer Childers read him "his rights" and commenced interrogating him. At that time defendant requested permission to phone Dawn Pritchett, his juvenile parole officer. He explained that he wished to speak to her before answering any questions because "she told me whenever I had trouble to call her." In response to defendant's plea for advice, Ms. Pritchett informed him that it would be in his best interest to

cooperate with the police. At the suppression hearing she stated that she advised defendant that it was the policy of the juvenile corrections department to cooperate with county and city law enforcement officials whenever possible; therefore, defendant should answer any questions that the police might put to him. Officer Childers testified that after this conversation the defendant announced, "I am ready to talk with you now. Go ahead. I will tell you what happened." The defendant then wrote the following statement which we quote in full:

> "(BS) Some tine in the Late after noon, Wed. feb. 10. (BS) I meat to runaws foron Kenetucky. how wanted a place to stay. I ask Both girls how old thay were thay Both sead 15½ years old. I tock the girls to my house and we stayed in the groge. We all slept on the same Bed. Sone time dering the night Teresa and I had sex. I used (BS) (BS) no force at all. (BS)."

Defendant testified at the suppression hearing that Childers suggested which words he should use in making the statement. In addition, defendant stated that he did not read the printed portion admonishing him of his rights before signing at the bottom of the page. At trial Childers testified that he did not know whether defendant understood the warnings, but that he assumed he did. Finally, the defendant asserted that at the time of the interrogation he was "half-asleep." After conducting an evidentiary hearing the court refused to suppress the defendant's statement as involuntary and the statement was subsequently admitted into evidence at trial.

■■ We consider first whether defendant's confession should have been admitted into evidence. In deciding this issue, it is incumbent upon us to ascertain at the outset whether defendant was adequately warned of his right to counsel and his privilege against self-incrimination prior to the interrogation. (*People v. Ruegger*, 32 Ill. App. 3d 765, 336 N.E.2d 50.) In this regard, we note that at no time during the suppression hearing did Officer Childers enumerate the specific warnings given the defendant. In his testimony Childers collectively referred to the "Miranda warnings"; however, assuming each of the warnings mandated by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, was given to defendant prior to questioning, it is undisputed that defendant twice asserted his right to remain silent in the presence of Officers Pelhank and Murphy. The People argued below that Childers was unaware of the defendant's prior refusal to speak with the arresting officers. This is not a proper consideration, however, since an arresting officer's knowledge that defendant has asserted a constitutional right will be imputed to an interrogating officer. *People v. Blanchard*, 37 Ill. 2d 69, 224 N.E.2d 813.

■■ While we acknowledge that a defendant's decision to remain silent

does not always foreclose further police interrogation, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda*, on whether his 'right to cut off questioning was scrupulously honored.'" (*Michigan v. Mosley*, 423 U.S. 96, 104, 46 L. Ed. 2d 313, 96 S. Ct. 321.) In *Mosley* the court found that the resumption of questioning two hours after defendant's decision to remain silent, preceded by another full and complete set of *Miranda* warnings, initiated by another police officer at another location and concerning an unrelated crime, did not violate the principles of *Miranda v. Arizona*. Lacking in our case is the final factor mentioned in *Mosley*, that is, interrogation for a different offense than the one about which defendant has refused to talk. In *People v. Washington*, 41 Ill. App. 3d 475, 354 N.E.2d 501, *aff'd*, 68 Ill. 2d 186, 369 N.E.2d 57, the appellate court concluded that defendant's right to cut off questioning was not scrupulously honored where resumed interrogation concerned the same offenses which had been the subject of an earlier interrogation. (See also *People v. Pendleton*, 24 Ill. App. 3d 385, 321 N.E.2d 433.) On the other hand, the court in *People v. Eason*, 44 Ill. App. 3d 308, 357 N.E.2d 1191, held that although the police subsequently interrogated the defendant for the same crime, the defendant voluntarily agreed to make a statement; thus, the principles of *Michigan v. Mosley* did not prevent the admission in evidence of defendant's incriminating statement. We need not decide whether subsequent questioning of the defendant regarding the same offense about which he has refused to talk is a per se violation of the defendant's right to remain silent within the purview of *Michigan v. Mosley*, for we find several other factors which, when combined with the resumption of questioning by Officer Childers, render defendant's statement involuntary.

■■ The test which governs the admission of a confession by an accused is usually stated as whether or not the statement "has been made 'freely, voluntarily and without compulsion or inducement of any sort,' or whether the defendant's will was overborne at the time he confessed. [Citations.]" (*People v. Hester*, 39 Ill. 2d 489, 497, 237 N.E.2d 466.) Voluntariness in this context is to be determined from the totality of the circumstances. (*People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied*, 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) Consideration must therefore be given to both the characteristics of the accused and the details of the interrogation. *People v. Simmons*, 60 Ill. 2d 173, 326 N.E.2d 383; *People v. Luckett*, 48 Ill. App. 3d 536, 362 N.E.2d 1297.

In looking at the characteristics of the accused, we must closely examine those factors which bear upon his ability to make knowledgeable and independent decisions. Factors such as age, intelligence, prior experience with the criminal law and emotional stability become especially pertinent. The defendant in this case was 17 years old at the

time of the offense; he has a somewhat less than average IQ and a serious learning disability. Approximately one month prior to the offense defendant withdrew from Harrisburg High School where he was then enrolled as a sophomore in a special education class. Defendant has been examined by numerous psychologists who all concur that he is emotionally immature and carries a deep resentment and distrust of parent and authority figures. In January of 1975 defendant was referred to the Egyptian Mental Health Department due to an attempted suicide arising out of his relationship with a girlfriend.

Defendant's previous experience with the law consists of curfew and resisting arrest charges in 1974 which were dismissed, a shoplifting offense for which defendant was placed under supervision of the court for one year commencing February 6, 1975, and a burglary offense for which defendant was committed to the Juvenile Division of the Department of Corrections on June 12, 1975. It is through this latter adjudication that defendant came to know Dawn Pritchett, his juvenile parole officer. We note that all of defendant's prior contact with the law has been through the juvenile court system.

■■ Since the Supreme Court's decision in *Haley v. Ohio*, 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302, courts have been particularly mindful of interrogations involving youthful offenders. Although the accused in that case was but 15 years old, much of what Justice Douglas there opined applies to this case as well. For example, we may not assume that a boy of defendant's age, without the aid of independent counsel, would have a full appreciation of the rights read to him. In *People v. Simmons*, 60 Ill. 2d 173, 326 N.E.2d 383, our own supreme court announced that when dealing with juveniles, there a 16-year-old borderline mentally retarded boy, a court must use special care in scrutinizing the record to insure that a confession was voluntarily given. Nevertheless, a statement elicited from a 17-year-old of subnormal intelligence is not necessarily inadmissible (*People v. Cooper*, 30 Ill. App. 3d 326, 332 N.E.2d 453, *cert. denied*, 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2206), but his youthful age as well as his familiarity with the English language (*People v. Baker*, 9 Ill. App. 3d 654, 292 N.E.2d 760), must weigh upon the final determination. We think it inconceivable that one could examine the grammar and spelling contained in the instant statement and conclude that defendant had anything more than a superficial familiarity with the English language. Moreover, the testimony adduced at the suppression hearing is equivocal with regard to whether defendant read and understood his rights. However, even under these circumstances, we are unable to say that the characteristics of the defendant alone rendered the confession involuntary.

We must also consider the details of the interrogation to determine if it was conducted under such a coercive atmosphere that the confession produced was involuntary. It is this aspect of the case which disturbs us most. Although the interrogating officer, Childers, came on duty at 10 p.m. on February 11, 1976, and although he, himself, ordered defendant's arrest around midnight, it was not until 3:20 a.m. that he commenced the interrogation. This kind of interrogation during the dead of night could only be designed to place defendant at a disadvantage. Not only was his sleep interrupted, but his chances of successfully engaging an attorney at that hour of the night were greatly reduced. Even more significant in our opinion is the actual advice he did receive. Defendant, of his own free will, phoned his juvenile parole officer seeking counsel as to whether he should make a statement to the police. It is undisputed that defendant chose to consult Ms. Pritchett because of the trust and confidence he placed in her and because she had encouraged him to rely upon her whenever he got into trouble.

We note that in these situations the juvenile officer assumes conflicting roles vis-a-vis the juvenile offender. For insight into the inherently coercive nature of the juvenile officer's influence over his or her charge, we quote from Law and Tactics in Juvenile Cases (3d ed. 1977):

"Probation officers are skilled in obtaining information from juveniles and in gaining their trust to encourage open communication. The therapeutic atmosphere created by the juvenile court staff is calculated to give juveniles the impression that the court staff are there to help them and that any statements made are confidential. Although this practice may be desirable from the rehabilitative *parens patriae* philosophy, statements made as a result of this subtle method are not voluntary for purposes of their admissibility into evidence. The juvenile officer should not be a two faced Janus, acting the friend and later becoming the prosecutor." (P. Piersma *et al.*, Law and Tactics in Juvenile Cases 93 (3d ed. 1977).)

It has further been stated that "a helping or counseling relationship is precluded by the nature of the probation officer's involvement with the child. This dilemma is well supported in self-image studies of probation officers showing that they consistently identify themselves with law enforcement officials." (Wheeler and Inskeep, *Youth and the Gauntlet*, 32 Fed. Probation 21-23 (1968).) In other words, "[c]hildren are susceptible not only to fear, fantasy and coercion, but also to gullibility." (Sanford J. Fox, The Law of Juvenile Courts in a Nutshell 133 (1971).) Although the above-quoted material has reference to juvenile court proceedings, we must ponder whether defendant's previous relationship with Ms. Pritchett

created a false sense of security and friendship so that her admonition to cooperate fully with the police rendered his statement involuntary.

It is evident that defendant regarded Ms. Pritchett as a friendly adult. Indeed, such a relationship is the object of the juvenile court system comprising the setting for all of defendant's previous experience with the law. Here the juvenile officer, ostensibly acting in the defendant's best interest, instructed him to answer all questions propounded by the police. Such was clearly not in the defendant's best interest. Thus, while seeking the advice of the friendly adult, the defendant was actually drawn into waiving his constitutional rights by one assuming an adversary position.

■■ This court has previously addressed similar situations of overbearing the will of a youthful offender. In *People v. Koesterer*, 44 Ill. App. 3d 468, 358 N.E.2d 295, we recognized the effect which a mother's plea and an attorney's advice to confess might have upon the will of a 20-year-old. In addition, we must distinguish our situation from those cases where a police officer or arm of the State merely suggests that it is advisable to tell the truth. (*People v. Wipfler*, 68 Ill. 2d 158, 368 N.E.2d 870; *People v. Ruegger*, 32 Ill. App. 3d 765, 336 N.E.2d 50.) In *Wipfler* the supreme court held that exhortation to defendant to tell the truth by the chief of police, whom defendant trusted as a friend and surrogate father, did not per se render the subsequent confession involuntary. In looking at the totality of circumstances present in that case, the court was unable to say that the statement was the product of coercion. In this case, however, Ms. Pritchett exerted her official influence, which had been established over several months preceding defendant's arrest, to induce defendant to confess. Moreover, it is obvious from the record that her advice was the direct cause of defendant's submission to the interrogation process. Prior to the phone call defendant had twice refused to discuss the offense with the police; yet, immediately after his conversation with Ms. Pritchett, defendant stated, "I am ready to talk with you now. Go ahead. I will tell you what happened." We conclude that this subtle coercion, when considered along with the characteristics of the defendant as well as his prior refusals to talk and the timing of the interrogation, rendered defendant's statement involuntary.

While we would not impose upon all parole officers the obligation of giving Miranda warnings to parolees seeking his or her advice, as the defendant suggests, we cannot ignore the coercion which exists whenever a misguided juvenile turns for crucial advice to an individual whom he has been led to believe will act in his best interest, his juvenile parole officer. "Voluntariness presupposes the willingness to talk uninfluenced by force, coercion, promise or intimidation of any kind." (*People v. Nemke*, 46 Ill. 2d 49, 55, 263 N.E.2d 97.) Looking at the totality of the circumstances surrounding the confession and considering the age,

emotional and mental capacity of this defendant, we are convinced that the trial court's determination that defendant voluntarily and without compulsion confessed to the crime of indecent liberties with a child is contrary to the manifest evidence.

■■ Moreover, admission of the confession in such a case violates due process. Thus, a finding that the defendant's confession was involuntary requires reversal regardless of the possibility that there might be other evidence sufficient in itself to support the conviction. (*People v. Hulet*, 66 Ill. App. 2d 194, 214 N.E.2d 299.) Nevertheless, aside from defendant's confession, the only evidence to sustain the conviction is the testimony of Taresa Dzuris who admits to having lied about her age and whose story could be easily fabricated. Thus, in any case, we could not say beyond a reasonable doubt that the court's error in admitting the confession did not contribute to the jury's verdict. *People v. Washington*, 68 Ill. 2d 186, 369 N.E.2d 57.

We reverse for yet another reason. During voir dire defense counsel unsuccessfully challenged two jurors for cause. As a result of the court's refusal to excuse these veniremen, Arthur Durham and Lelia Puckett, counsel was forced to expend two of his peremptory challenges to remove them from the panel. At the close of the selection process defense counsel sought to challenge another venireman, Ruth Choisser, for cause, which challenge was also refused. Since defendant had previously exhausted all of his peremptory challenges, the juror was accepted and participated in the verdict. Defendant contends that due to the court's erroneous denial of his challenges for cause of the former two veniremen, he was denied his right to trial by a fair and impartial jury when the latter juror was allowed to remain on the panel. In order to fully appreciate defendant's objection to these jurors, we shall briefly review the pertinent voir dire examination.

## ARTHUR DURHAM:

"Q. Do you feel that you could be fair and impartial if you were accepted as a juror?
A. I don't think I could.
Q. Why couldn't you?
A. I believe any time anybody is charged, I feel there is evidence there of their guilt.
Q. You would listen to the evidence though, wouldn't you?
A. I would listen, yes.
Q. Would you return a verdict of not guilty if he wasn't proven beyond a reasonable doubt?
A. I would.

Q. And you would return a verdict of guilty if the evidence showed that he was guilty beyond a reasonable doubt?

A. I would."

That afternoon Mr. Durham was further questioned as follows:

"Q. Do you believe that since the man is accused by the police that probably he is guilty?

A. I think there must be something to the charge. When they arrest you, they don't arrest for false accusations generally speaking.

Q. So probably then, the defendant is guilty in your mind?

A. He could be.

Q. As the defendant sits here before you now, do you consider him to be guilty or innocent?

A. Well, I don't know.

Q. You are not sure whether—

A. No. I am not sure. He is charged; there must be something. It was probably investigated and everything before charges were made.

Q. So now as we begin the case you believe that probably he is guilty of something?

A. Might be."

## LELIA PUCKETT:

"Q. Do you feel you could be fair and impartial if you were accepted as a juror?

A. No, because I have seven (7) children and small grandchildren. I don't think so.

Q. You could listen to the evidence, couldn't you?

A. Pardon?

Q. You would listen to the evidence, wouldn't you?

A. Yes, I would.

Q. And give a fair decision, wouldn't you?

A. Right.

COURT: You may inquire.

Mr. Fornes: Mrs. Puckett, you expressed some reservations about your ability to be impartial because of your children and grandchildren.

A. Yes. Well, you always put your family—this may be happening to them.

Q. Does this frighten you?

A. Yes, it does.

Q. Would you be afraid then, that if you didn't convict Bobby that it might happen to your family?

A. That had crossed my mind, yes.

Q. Well, your tendency would be then in listening to the evidence to try and convict him no matter what you heard from the evidence?

A. I feel that I would be thinking of my family, very definitely.

Q. That would make you vote guilty?

A. Well, I would listen first, naturally.

Q. Would you listen with an open mind?

A. Yes, I think I would.

Q. If there was any doubt in your mind, would you exercise that doubt in favor of Bob?

A. I don't know.

Q. If you had a reasonable doubt of whether or not Bob did what he is accused of, would you vote not guilty?

A. I still don't know. I am not sure.

\* \* \*

Q. Mrs. Puckett, ma'am, do you presume him to be guilty or innocent?

A. Well, he was picked up for something.

Q. So you think he is probably guilty?

A. Well, I know you have to prove a case but I said he was picked up for a reason."

## RUTH CHOISSER:

"Q. You have heard the charge against the defendant here. Is there anything about that that would prejudice you against the defendant right off the bat?

A. Yes, I believe there is.

Q. So, because of the nature of the charge you would tend to vote against the defendant?

A. Yes.

Q. In other words, you wouldn't require the state to prove him guilty beyond—

A. Yes, I think the State should prove he was guilty.

Q. But because of the type of charge here, you think that he is probably guilty anyway?

A. That is the question—I would have to know more about the circumstances.

Q. When we started out, I asked you if there was anything about

these charges that would prejudice you against the defendant and you said there was. Could you explain that for me?

A. Well, just the nature of the charge, I suppose.

Q. How would that affect you?

A. You asked me if I had grandchildren. I have some grandchildren.

Q. So, because of the nature of the charge and because of the fact that you have some granddaughters you would be unable to give the defendant the benefit of any reasonable doubt you might have?

A. Well, he is innocent until he is proved guilty, isn't he?

Q. Do you presume him to be so?

A. Yes.

Q. Would you require the defendant to prove himself innocent?

A. Well, I guess so if it had already been proved that he is guilty.

Q. So you would or would you not require Bobby Stone to prove to you that he is innocent?

A. Yes.

Q. Which, Mrs. Choisser?

A. That he had to prove that he was innocent."

With regard to the statement of Mrs. Choisser, we note that earlier during voir dire the court excused for cause a Mrs. Eva Yother whose responses were substantially the same as Mrs. Choisser's.

## EVA YOTHER:

"Q. Do you believe that because a man is charged with a crime that probably he is guilty of a crime?

A. I wouldn't say because I don't know.

Q. Would you give the defendant the benefit of a reasonable doubt if such remained in your mind?

A. Yes sir, I would.

Q. Do you presume him to be innocent now?

A. Yes.

Q. Would you require the defendant to prove himself innocent to you?

A. Yes, I would, because I don't know the boy.

Q. You would require then that the defense prove to you that he was innocent?

A. Yes."

A criminal defendant's right to trial by a fair and impartial jury is firmly rooted in our constitution. (Ill. Const. 1970, art. I, §8.) This right is so basic

that a violation thereof requires a reversal. (*People v. Cole*, 54 Ill. 2d 401, 298 N.E.2d 705, citing *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437.) While impartiality is not a "technical conception," it is a state of mind which must be ascertained from the statements made by the prospective jurors. A person is not competent to sit as a juror if his mental attitude is such that a defendant will not receive a fair and impartial trial with him or her as a member of the jury. (*People v. Cole*, 54 Ill. 2d 401, 298 N.E.2d 705.) An impartial jury has been further described as "one made up of persons prepared to exercise their personal judgment, favoring neither prosecution nor accused, standing indifferent to both, and guided only by law and the evidence in the performance of their duties." (*People v. Hobbs*, 35 Ill. 2d 263, 270, 220 N.E.2d 469, *cert. denied*, 386 U.S. 1024, 18 L. Ed. 2d 463, 87 S. Ct. 1381.) Although a juror's competence is initially a determination for the trial court, such judicial determination will be set aside if it is against the manifest weight of the evidence. *People v. Cole*, 54 Ill. 2d 401, 298 N.E.2d 705.

■■ In reviewing the voir dire examination of veniremen Durham, Puckett and Choisser we are struck by their reluctance to assume the impartial position required of them as jurors. Indeed, the record is replete with expressions of self-doubt concerning their ability to be impartial. Despite an occasional hint of neutrality these veniremen each displayed marked signs of prejudice. Moreover, a court should not single out certain statements but should regard the examination of each prospective juror as a whole to determine that individual's state of mind. We feel that the court's refusal to excuse these veniremen for cause was reversible error.

For the foregoing reasons we reverse the judgment of the circuit court of Saline County and remand for a further proceeding consistent with this opinion.

Reversed and remanded.

EBERSPACHER, P. J., and KARNS, J., concur.