THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee; *v.*
CONNIE KOESTERER, Defendant-Appellant.

Fifth District No. 75-458

Opinion filed November 18, 1976.

Edward J. Kionka, of Southern Illinois University School of Law, of Carbondale, and William E. Brandt, of Granite City, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Robert L. Craig, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Connie Koesterer, was convicted in a trial without a jury of the September 26, 1974, armed robbery of the Caseyville Pharmacy. She was sentenced to a term of imprisonment of not less than 4 years nor more than 4 years and 1 day. From the judgment of conviction and sentence defendant appeals.

Defendant raises several issues in this appeal. However, as will be discussed hereinafter, our disposition of this case requires a discussion of only the first issue raised, that is, whether the trial court erred in denying defendant's motion to suppress a confession or statement given by defendant to Detective Don Knight of the Granite City, Illinois police department on the afternoon following the armed robbery.

The statement in question was written by Detective Knight on 3½ pages of yellow, lined, legal-size paper and was signed by defendant. Defendant filed a pretrial motion to suppress the statement, and on September 16, 1975, a hearing was held on the motion during which several witnesses testified. At the end of the hearing the court denied the motion to suppress, and the statement was thereafter admitted at trial.

It is clear from the record that without the admission of the statement at trial, defendant would not have been convicted. At the end of the trial the court, which acted as the trier of fact, twice commented about the crucial nature of this statement. First, addressing the trial attorneys, the court stated:

> "Gentlemen, in view of the evidence, and I would say for purposes of the record so that everything is clear here, without the confession or statement of September 27, 1974, I don't feel that the State would have proved the case beyond a reasonable doubt. But with the statement which I have admitted into evidence for reasons that I have stated in an Order given to you this morning, I feel that the State has proved beyond a reasonable doubt that the defendant, Connie Koesterer committed the offense of armed robbery * * *."

Later, addressing defendant, the court stated:

> "All right, Miss Koesterer, I'm going to permit you to remain free under bond, under the bond that is already posted in this case. I want you to know, however, that this is the first time since I've been a Judge that I have allowed someone convicted of a Class felony to walk out of my courtroom. Ordinarily, I would have, if you or anyone else, I would have the bond revoked and order you held without bond pending disposition. But under the circumstances, because in my judgment the case is not made against you without the confession and because of issues that have been raised in that confession, I would permit you to remain free under bond."

■ ■ In light of the crucial nature of the statement, defendant's conviction can only stand if the statement was properly admitted at trial. Whether the statement was properly admitted depends on whether the confession was made freely, voluntarily, and without compulsion or inducement or promises of any kind, no matter how slight. (*Haynes v.*

*State*, 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336; *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489.) "And, of course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all the attendant circumstances." *Haynes v. State*, 373 U.S. 503, 513, 10 L. Ed. 2d 513, 521, 83 S. Ct. 1336, 1343.

The circumstances surrounding the instant defendant's statement were described by the various witnesses testifying at the hearing on the motion to suppress the statement. Our determination of the voluntariness of defendant's statement requires a summary of that testimony.

One of the witnesses testifying at the suppression hearing was Officer Erv Keuenhoff. Keuenhoff stated that he had been an officer with the Granite City police force for 10½ years and was working the 9 p.m. to 5 a.m. shift September 26 and 27, 1974. At approximately 2 a.m. on September 27, while on patrol, Keuenhoff saw defendant and another female, Roberta Jackson, in the parking lot of the Travel Lodge Motel in Granite City. He sat and watched for approximately 10 minutes until Jackson left the parking lot in her car and defendant entered Room 104 of the motel. Keuenhoff followed Jackson, stopped her car, and questioned her about who was present in the motel room defendant had entered. Jackson told Keuenhoff that defendant, a male, and a female named Barby Nelson were in the room but did not say what they were doing. Keuenhoff was aware that previously a warrant for the arrest of the defendant had been issued, and he radioed to the police dispatcher to inquire whether the warrant was still outstanding. The warrant had been issued on a charge of deceptive practices which Keuenhoff thought had probably been a misdemeanor. The dispatcher advised Keuenhoff that the warrant was still outstanding. Keuenhoff then radioed for a Lieutenant Mitchell to come to his assistance. When Keuenhoff arrived back at the motel he noticed that a yellow Nova, which belonged to Barby Nelson and which had been in the parking lot when he left to follow Jackson, was no longer there.

Mitchell arrived and the two officers knocked on the door of Room 104. They received no response, so they had the night clerk of the motel come and open the door with a pass key. The officers and the clerk entered the room and turned on the lights. They found defendant and a David Hill lying in bed. They were either awake or awoke when the policemen and the clerk entered. Keuenhoff advised defendant that she was under arrest. He could not tell whether defendant was under the influence of any drug, although he admitted that he could not say that she was not. He "didn't look into her pupils and so forth." In "open view" Keuenhoff found a bottle of the drug preludin. The seal of the bottle had been broken. He found a box labeled "preludin, 100 tabs." He also found some

hypodermic syringes in the room. In a drawer he found cotton with blood on it and a spoon.

After the arrest Roberta Jackson was called and asked to come to the police station. She came and was interviewed by a Detective Harris and Keuenhoff at approximately 4 or 4:30 a.m. Jackson stated that a large quantity of drugs was in the motel room, which had come from an armed robbery in Caseyville.

Sometime during the night Keuenhoff had heard a report over the radio that an armed robbery had occurred in a Caseyville drugstore involving a male and two females in a yellow Chevrolet Nova. After the arrest, "as [he] put all the pieces together, the drugs, the car and so forth," Keuenhoff began to suspect that defendant had been involved in the armed robbery. He made a written report in which he stated that defendant should be interviewed as soon as possible because she seemed willing to talk. In the report he also stated that he believed defendant and Hill may have been involved in the armed robbery of the Caseyville pharmacy. After making the written report, Keuenhoff left the police station at approximately 5 a.m.

Although Detective Harris and the other police officers on duty would have had access to Keuenhoff's report, Keuenhoff testified that he did not know whether anyone in fact looked at the report before defendant was interviewed. Keuenhoff could not recall whether he had personally communicated to Harris his suspicion that defendant had been involved in the armed robbery.

Shortly after 9 a.m. Keuenhoff returned to the police station. There he saw defendant and her attorney. Although Keuenhoff testified that he could not recall whether he had told defendant's attorney that he suspected that defendant had been involved in an armed robbery, he felt that he would not have so advised the attorney. ("You being her counsellor, I don't think I would have, I don't know.") While Keuenhoff was present with defendant and her attorney, the attorney advised defendant "to tell them everything" and that he had to leave to "catch a plane."

Detective Don Knight, the officer who obtained from defendant the written statement in question, testified at the suppression hearing as follows. He had been a detective for 1½ years and a policeman for 5 years. On the morning of September 27, 1974, he came to work at the Granite City police department at 5 or 10 minutes after 8 o'clock. When he first came in he looked at the "prisoner list" and saw the names of defendant, David Hill, and Barby Nelson on the list, the latter being listed as in the hospital.

At 9:15 a.m. Knight talked with defendant's attorney. The attorney had spoken with defendant earlier. The attorney and Knight discussed the fact

that there were three charges pending against defendant, namely, forgery, a prior drug possession, and the drug possession charge resulting from her arrest in the motel room a few hours earlier. They also discussed the possibility of a plea bargain. The attorney then again went to speak with defendant and returned to speak with Knight and Keuenhoff about the possibility of a plea bargain. Officer Keuenhoff "agreed," and the attorney again went to speak with defendant. The attorney then gave Knight permission to interview defendant and left before the interview began. The attorney "had an appointment out of town and he had to get on a plane and go someplace." Before the attorney left Knight told him that he had spoken with the State's Attorney and that the State's Attorney had agreed not to oppose a recognizance bond.

Knight began questioning defendant at 9:30 or 10 a.m. The interview lasted until approximately 11:30 a.m. The purpose of the interview was "[t]o more or less find out where the drugs come from and find out who had brought them there and just generally, you know, try to make the case." Detective Harris participated in the interview "later on." At the time of this interview Knight was aware that Keuenhoff had made a written report; but Knight had not yet read the report.

At the beginning of the interview, Knight read the *Miranda* warnings to defendant. The defendant "indicated she knew her rights" and agreed to talk without having her attorney present. Defendant was not restrained in any way, and responded to the questions asked by Knight. Her voice was "[n]ormal, except the times when she would be, you know, concerned about her present arrest."

During this interview Knight had not asked defendant for a written statement because he felt that he was not getting the "full story." The defendant told him that the drugs had been brought into the motel room by a Donna Phelps from a Danny Farley.

Knight testified that he had had an opportunity to observe someone under the influence of alcohol or drugs approximately once per week for 5 years prior to this interview. However, it was his opinion at the time of the interview that defendant was not under the influence of any type of drug. However, during the interview defendant told Knight that she had "shot up" preludin once or twice around midnight in the motel room. Knight had also noticed "track marks" on her arms, but he did not know whether they were "fresh." Knight admitted that defendant seemed "shook-up" during the interview and was crying quite a bit.

At the end of the interview defendant was taken to a jail cell for lunch. Around noon her parents arrived and were allowed to see her in Knight's presence. Knight told the parents that he was not getting the truth from defendant, and they then urged defendant to tell the truth "to get the whole thing straightened out." Knight also told the parents that he had

spoken with the State's Attorney and that the State's Attorney had agreed not to oppose a recognizance bond.

Sometime around noon Knight received information that defendant may have been involved in the armed robbery of the Caseyville Pharmacy. When he received this information he tried to contact the defendant's attorney through defendant's parents, although he thought the attorney was "on a plane going somewhere."

After defendant's parents had left the police station, Knight began interviewing defendant again at 2 p.m. Defendant told Knight that she, David Hill, and Barbara (Barby) Nelson had robbed a drugstore. After defendant gave Knight this oral statement, he asked whether she would give a written statement. Defendant stated that she would give a written statement if Knight would allow her to return a ring to her boyfriend, David Hill. She was allowed to do so, and at 2:30 p.m. Knight began to take the written statement from defendant.

The statement was written by Knight from answers given by defendant in response to Knight's questions. It took 2 hours to complete the written statement. During that time Detective Harris was also present. Defendant was thirsty and drank water during the questioning. She did not ask for medical help.

After the written statement had been completed, defendant read the statement, asked Knight where he had gone to school, and made a few written corrections of spelling and grammar in the statement. She then signed the statement and Knight and Harris signed as witnesses.

Also testifying at the hearing on the motion to suppress the statement was Detective William Harris. Harris stated that he had been a detective with the Granite City police force for 1½ years and, prior to that, he had been a patrolman for 11½ years. On the morning of September 27, 1974, he was called at 4 a.m. and asked to come to work to investigate a drug case. He arrived at 4:30 a.m. At that time "they had Barbara Nelson in a room and they was talking to her." Later that morning Barbara Nelson was taken to the hospital to be treated for a drug overdose.

Roberta Jackson, a friend of defendant, had been called by Officer Keuenhoff and asked to come to the police station for questioning. She came to the police station, and at 7 a.m. Harris questioned her. Jackson told Harris that there was a large quantity of drugs in the motel room where defendant had been arrested. She stated that the drugs had come from a robbery of a drugstore in Caseyville, Illinois. However, she did not say who had robbed the drugstore. She indicated that the drugs had been brought to the motel room by a Danny Farley or one of Farley's associates.

Harris spoke with Officer Keuenhoff before Keuenhoff left the police station that morning. Keuenhoff indicated that defendant should be

interviewed as soon as possible because she was willing to talk. Keuenhoff also indicated that the drugs had come from Caseyville. However, Harris did not see Keuenhoff's report that morning, and he was not advised until that afternoon that defendant may have been involved in the armed robbery of the Caseyville Pharmacy.

Harris was "in and out of the room" during the interviews of defendant, although he did not actually participate in the questioning. During the morning interview defendant indicated that the drugs had been brought to the motel room by someone else.

During the afternoon interview Harris was present when defendant read the written statement. He heard her remark about Knight's grammar and make some corrections of grammar in the statement. Harris stated that he could not recall whether the defendant was crying or seemed under the influence of drugs or whether she had needle marks on her arms.

Defendant testified at the hearing on the motion to suppress as follows. She was 20 years old and had been "on drugs" for 4½ or 5 years. She used "pot, acid, mainly amphetamines," particularly "preludin, crystal, methamphetamines." She had been taking 30 to 50 pills of preludin per week, each pill containing 75 milligrams of the drug. When preludin was not available, she took a gram of "crystal," a methamphetamine. She took the drugs intravenously. During the week of her arrest, she had been taking two or three pills of Tuinal, a barbiturate, per day. Each pill consisted of 3 grains. Along with these she had also been taking four Dalmane pills, also a barbiturate, per day. On September 26, 1974, she took Dalmane and Tuinal at 8 p.m.

On the night of September 26, 1974, defendant had received some drugs from Barby Nelson. Defendant placed 100 preludin tablets, each tablet consisting of 75 milligrams, in a small amount of water. This she boiled until she had 9 c.c.'s of solution. After the 10 o'clock news she injected one-third of this solution into her vein. She injected another third of the solution when Roberta Jackson came to the room at midnight. She injected the remaining third of it at approximately 1:30 a.m. She was "pretty sure" Jackson may have also used some preludin and thought Barby Nelson may have.

After the third injection defendant began to "pass out" and lay on the bed. After this someone walked into the motel room, and defendant screamed because she was not dressed. She was then taken to jail.

Defendant testified that she remembered seeing her attorney for approximately 30 seconds at the police station, and she "vaguely" remembered him telling her to talk to the police. She also remembered the attorney saying that he was going out of town. At the police station she kept asking for something "to go to sleep." She had no idea of what time

or what day it was, because she had not slept. When she was in the jail cell, she "kept knocking the walls," so a policeman tied her arms to a bed frame with something "like a halter top." Defendant remembered seeing her parents at the police station and their telling her to talk to the police.

Defendant testified that the signature at the end of the written statement looked like her signature; however, she was unable to recall signing the statement. She admitted that some of the writing on the pages was her handwriting. She stated that on the morning of September 27, 1974, she was "dizzy" while talking with the policemen and "repeatedly" asked for medical help.

As to the effect preludin had on her, defendant stated that it creates a state of "uropia [sic]." She explained that it [m]akes you fantasize" and "think you rule the world." Under the influence of preludin, "you can communicate but you are in your own world."

After defendant testified at the suppression hearing, her mother, Mrs. Norma Jean Koesterer, testified. She stated that she had first become aware that defendant was a drug user in 1971. She had found "syringes, burnt spoons, pills" in defendant's room. Since that time Mrs. Koesterer had seen defendant under the influence of drugs throughout the 4 years. Mrs. Koesterer had consulted all the drug rehabilitation centers on the matter. In August of 1974 Mrs. Koesterer had defendant hospitalized in St. Vincent's Hospital because of her drug problem. Defendant remained hospitalized there until September 5, 1974.

On September 27, 1974, Mrs. Koesterer saw defendant at the Granite City police station at 12:30 p.m. When Mrs. Koesterer first saw her, defendant was in a jail cell "just screaming and crying." Defendant's condition was the worst Mrs. Koesterer had ever seen. Mrs. Koesterer "thought she had completely flipped." Mrs. Koesterer stayed with defendant for approximately 45 minutes in the jail cell but was unable to "calm her down" and nothing Mrs. Koesterer said "seemed to affect her at all."

Earlier in the day Mrs. Koesterer had spoken with defendant's attorney and had been advised that defendant "was to cooperate fully" in order that she could get "out of town to California" where she would be placed in a drug rehabilitation program. The attorney had advised Mrs. Koesterer to make the arrangements to send defendant to California that evening. At the police station Mrs. Koesterer spoke with Detective Knight about defendant's "cooperation, getting her out of town." The police officer promised leniency in that if defendant cooperated she would be able to get out on bond and leave town in order to enroll in a "controlled living situation" in California.

Mrs. Koesterer and her husband remained at the police station until approximately 4:30 p.m. As far as being able to communicate with

defendant during that time, Mrs. Koesterer stated: "Just about the time you thought you were, you weren't. I mean we repeated things over and over. That's why we stayed there so long." At one point an Assistant State's Attorney came into the police station and stated that there would be "no deals" with respect to defendant's case. However, Detective Knight told Mrs. Koesterer that they "could possibly get around this man." Mrs. Koesterer understood Knight's remark to mean that she need not worry about what the Assistant State's Attorney had said; that "the deal" had been made, and that they should "cooperate fully."

Mrs. Koesterer "begged" defendant to cooperate fully. Finally, however, she left the interview because Detective Knight thought he would "have better success" with a "one to one type of relationship." At 10:45 or 11 p.m. that evening Detective Knight telephoned Mrs. Koesterer and informed her that he had "just finished up with" defendant at approximately 9:45 p.m.

Mrs. Koesterer testified that the police had never informed her that defendant was being questioned to determine whether she had been involved in an armed robbery. However, by overhearing telephone conversations the policemen were having in her presence, Mrs. Koesterer became aware that this was the purpose of the questioning. In response to questions propounded by the court at the suppression hearing concerning whether Mrs. Koesterer had expressed that defendant was under the influence of drugs on September 27, Mrs. Koesterer explained, "It was a thing so obvious, it was almost like you didn't need to make a statement." Finally, Mrs. Koesterer testified that on September 29, 1974, 2 days after the statement in question was written, Mrs. Koesterer visited her daughter in a jail cell and saw her in a straightjacket.

Dr. James A. Ferrendelli, a neurologist and pharmacologist, testified after Mrs. Koesterer. Dr. Ferrendelli stated that four or five of the 75 milligram tablets of preludin, taken orally, would make a person "hyper-excitable, irritable, constantly pacing, easily provoked to laughing or crying." He stated that 10 or 12 tablets might cause "toxic psychosis" which would cause the person to "demonstrate the symptoms of schizophrenia or psychosis." The person might "hallucinate, be grandiose, have completely inappropriate behavior."

Dr. Ferrendelli was asked to express his opinion about the effect that Dalmane and Tuinal followed by the injections of preludin defendant claimed to have taken in the motel room would be expected to have on an individual with defendant's history of drug usage. Dr. Ferrendelli stated that the amount of preludin defendant claimed to have injected was a very high dosage; it was "about four times the toxic lethal dose even in a highly tolerant individual." He stated further that with such a dose "you would expect a toxic effect"; the person would "tend to be hyperactive,

somewhat irrational, perhaps grandiose," and "might develop a frank psychosis, hallucinate, be delusional, be unable to judge reality." Dr. Ferrendelli explained that the Tuinal and Dalmane, being depressants, would counteract some of the "side effects" of the preludin but would also modify "things" causing the person to have even "more difficulty testing reality" and "dealing with reality." Dr. Ferrendelli stated that it would take 5 to 7 days for the body to "wash" these drugs out completely, and that the psychosis caused by the drugs would last that entire period. He stated that approximately 12 hours after the drugs were taken even the highly tolerant user would be irrational, although not completely so, and would have lucid intervals during the time the drugs remained in the person's body.

In response to questions propounded by the court, Dr. Ferrendelli stated that it would be difficult for a layman, such as a policeman, to determine whether the person was in a lucid period or an irrational period. However, the layman could make that determination by asking the person to answer questions every normal person would be expected to know, such as, "who's the President of the United States," and "who their parents are, what their address is," and by asking the person to perform "calculations and interpret moral statements."

Detective Knight testified in rebuttal that he could not recall telling Mrs. Koesterer that they could get around the Assistant State's Attorney. He stated that he did not promise defendant or her mother that charges would be dropped for her cooperation. He stated that he did not finish taking the written statement during his regular working hours, rather "it went over into after five o'clock."

Detective Knight stated that his first knowledge of defendant's claim that she had been placed in a straightjacket while in custody came in conversation he had had with defendant a few days prior to the suppression hearing. Knight contradicted himself by stating that he, in fact, was the one who first mentioned the matter in the conversation with defendant and that actually sometime before that conversation defense counsel had asked Knight whether a straightjacket had been used.

At the close of all the evidence presented at the hearing on the motion to suppress the confession, the court stated, in part:

"On the Motion to Suppress the Confession, I'm going to deny the motion, because I think the test in a Motion to Suppress is whether or not the police officials who have obtained the statement have, by use of force or promises of leniency, obtained the statement, and whether or not the person who's given the statement has been advised of his rights under the Miranda decision. I am fully aware of the issues raised in the defendant's Motion to Suppress, but the doctor who was called on behalf of the

defendant stated that although he as a doctor would recognize symptoms of being under the influence, the layman wouldn't know those symptoms unless they had some type of training to recognize them. I think it would be an unfair and impossible burden to add to the police officers to know when a person who is under the influence as indicated by the hypothetical question. The answer to the hypothetical question was that the person would be under the influence for five to seven days with various periods of lucidity. It just seems to me it would be an impossible burden to place on a police officer to know when that person who he is talking to is lucid, would actually be under the influence of drugs as indicated by the doctor."

In a hearing on a motion to suppress a confession the burden of going forward and the burden of proving the voluntariness of the confession are on the State. (Ill. Rev. Stat., ch. 38, par. 114—11(d).) The question of voluntariness is, in the first instance, for the circuit court to determine. (*People v. Simmons*, 60 Ill. 2d 173, 326 N.E.2d 383.) That determination must be made by a consideration of all the attendant circumstances (*Haynes v. State*), that is, in determining whether the statement was voluntary the court must look at the totality of the circumstances to see whether the statement was freely and voluntarily given, without compulsion or inducement of any sort (*People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied*, 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731) and without "any direct or implied promises, however slight." (*Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 659, 84 S. Ct. 1489, 1493.) Moreover, an essential question in determining the voluntariness of a confession in a case like the instant case is whether the accused was deprived of his free choice to admit, deny, or refuse to answer. *People v. Gunn*, 15 Ill. App. 3d 1050, 305 N.E.2d 598.

■■ In light of this authority, it is apparent that the standard applied by the court below in denying the motion to suppress was impermissibly deficient. The court held the test to be whether the police had obtained the confession by use of force or promises of leniency and whether *Miranda* warnings had been given. Clearly the giving of *Miranda* warnings, even when their adequacy is undisputed, is not *per se* sufficient to make a confession given thereafter voluntary. (*People v. Hill*, 39 Ill. 2d 125, 233 N.E.2d 367; *People v. Ruegger*, 32 Ill. App. 3d 765, 336 N.E.2d 50; see *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) A confession given even after a *Miranda* warning can still be involuntary, for although the *Miranda* warning is an important factor for the court to consider, it is only one factor which must be considered. *Brown v. Illinois.*

Furthermore, it is not just force or promises of leniency that can invalidate a confession. It is possible for one's free choice to admit, deny,

or refuse to answer to be overcome not only by force or promises, but also by the effect of drugs. See *Townsend v. Sain,* 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745.

In the instant case, the standard applied by the court in the suppression hearing did not take into account the possible effect the drugs defendant claimed to have taken may have had on her giving the statement in question. Moreover, the court's comments reflect that in determining the voluntariness of the statement the court actually discarded all considerations of the possible effect the drugs might have had on defendant. The court indicated its feeling that it would have been "impossible" for the police to know whether defendant was or was not under the influence of drugs. It is for the court to determine what effect the drugs might have had at the time the statement was given along with all the other attendant circumstances, even if one or more of the police officers testify that the defendant was perfectly lucid at the time of the confession.

In light of the fact that the court applied an improper standard in deciding the question of voluntariness and the fact that defendant's conviction critically depended upon the admissibility of the confession, we must vacate the judgment of the circuit court. (*People v. Simmons.*) Moreover, unless we can say on the record before us that the confession was not voluntary, we should remand this cause for the circuit court to redetermine the voluntariness issue under the appropriate standards. *People v. Simmons.*

■■ Our examination of the record compels us to say that the written statement taken from defendant was not voluntarily made and that remand of this case is therefore improper. First of all, there was ample evidence showing that defendant had used a large quantity of drugs a few hours before her interrogation. Officer Keuenhoff found an empty, 100-tablet bottle of preludin, syringes, bloody cotton, and a burnt spoon in the motel room where defendant was arrested. Detective Knight noted "track marks" on defendant's arms. Moreover, defendant testified that she had taken a very large amount of preludin intravenously between 10 p.m. and 2 a.m. Dr. Ferrendelli explained that such an amount would have made the user irrational and unable to judge reality for 7 days although the user might have intermittent periods of lucidity during that period.

■■ However, even if we were to assess the credibility of the witnesses in favor of the prosecution and find on the basis of the testimony of Knight and Harris that defendant was lucid, or even if we were to assume, *arguendo,* that defendant was completely uninfluenced by any drugs at the time her statement was taken, we still could not find the statement to have been voluntary. The testimony of Mrs. Koesterer and that of Detective Knight clearly showed the statement to have been induced by a

promise that the State's Attorney would not oppose a recognizance bond, which would have allowed defendant to enroll in a drug rehabilitation program in California, if defendant "cooperated fully." It was this inducement that prompted the attorney's advice to defendant to cooperate with the police. Similarly, it was this inducement that prompted Mrs. Koesterer to "beg" defendant for four hours to give the police the information they were seeking and that prompted Mr. and Mrs. Koesterer to go home when Detective Knight told them that he would probably have "better results" with defendant if the parents went home. The instant case is, in these respects, very similar to *People v. Ruegger*, in which the appellate court affirmed the lower court's determination that a confession was involuntary. In that case the confession had been induced by the promise of the police that they would "go to bat" on such matters as a recognizance bond in return for the accused's cooperation and by the "subtle compulsion" added by a relative's encouragement of the accused to confess. See *People v. Ruegger*, 32 Ill. App. 3d 765, 771, 336 N.E.2d 50, 54-55.

It is true that defendant had been told by her attorney that she should cooperate fully and that he would be leaving to fly to New York. With this advice in mind, as well as the knowledge that her attorney was unavailable, defendant could not have benefited from the full effects intended by the *Miranda* warnings.

Under all of the circumstances surrounding the taking of the statement in question, we conclude the statement was not voluntary. The statement should not have been admitted into evidence at defendant's trial, and without it, defendant would not have been convicted. Therefore, the judgment of conviction is reversed.

Reversed.

G. J. MORAN and CARTER, JJ., concur.