THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL HANLON, Defendant-Appellant.

Second District   No. 2—84—0311

Opinion filed October 8, 1985.

G. Joseph Weller and Jan K. Dargel, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko, Cynthia N. Schneider, and Dale M. Wood, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Michael Hanlon, was charged in Kane County by information with the unlawful possession of more than 30 grams of a substance containing methaqualone and intent to deliver that substance. (Ill. Rev. Stat. 1983, ch. 56½, pars. 1402(a)(9), 1401(a)(9).) The jury found him not guilty of intent to deliver, but guilty of possession. The trial court sentenced him to four years in the Department of Corrections.

He appeals, contending (1) the unnamed informant's tip which led to his arrest was unreliable and the evidence seized as a result should have been suppressed; (2) three remarks made in contravention of the trial court's ruling *in limine* denied him a fair trial; (3) his "terror-like" anxiety upon the threat of incarceration rendered his statement involuntary and it should have been suppressed; and (4) remand for resentencing is warranted where the offense for which he was convicted became a probationable one a short time after sentence was imposed.

At the hearing on the defendant's motion to suppress evidence, Batavia police detective Robert Wochner testified that at 6:30 p.m. on January 21, 1983, a man with whom the officer was familiar came to the police station. He was a 21-year-old male with whom Wochner testified he personally had had dealings in his professional capacity. Wochner also was aware of some other dealings with other Batavia police department personnel. The informant told Wochner that a man called "Mike" was selling Quaaludes at C.J.'s, a bar in Batavia; he

saw several such sales take place. He told Wochner that "Mike" had over 50 tablets in a baggie in the outside lower right-hand pocket of a jacket, which Mike wore over a "C.P.O.," which the informant described in detail to Wochner. The informant showed Wochner a tablet he purchased shortly before from Mike for $3, a "Lemmon 714." Wochner compared the tablet with the Physicians' Desk Reference and determined that a "Lemmon 714" was methaqualone. Based on the detailed description of "Mike" from the informant, Wochner showed him a photograph of Michael Hanlon, the defendant here, and the informant identified him as the man selling tablets in the bar. Wochner and his partner, Batavia detective Frank Knight, went to the bar in question about 7:30 that evening and found the defendant. When the detective asked the defendant to step outside to talk, the defendant picked up and tried to put on a blue down jacket which appeared to be too small for him, and someone said, "Hey, that's not your jacket." Wochner saw the jacket which had been described to him by the informant on a chair across the room, and he asked the defendant if it belonged to him. When the defendant said "No," Wochner held up the jacket and asked the other people in the pool room if the jacket belonged to any of them, but received no answer.

Wochner then reached into the upper right breast pocket of the jacket and found a "court paper" containing the defendant's name; it was a DUI arrest from Elgin. He observed a plastic baggie in the lower right jacket pocket; took it out, and found it contained "several tablets marked 'Lemmon 714.'" The defendant was placed under arrest.

On cross-examination, Wochner acknowledged that the report he prepared on the incident contained no reference to an informant. He could not recall testifying at the preliminary hearing that an informant, whose voice he testified he did not recognize, contacted him by telephone regarding this incident, rather than in person. He also stated that he did not ask the defendant if he could search his coat, did not see him violating any laws or ordinances, and did not attempt to secure either an arrest or search warrant. He testified there was no agreement or arrangement for having the informant go to C.J.'s that evening, and the informant did not work for Wochner for money. Wochner stated the informant was not ever a defendant in a case he had anything to do with, although he may have been arrested sometime. Wochner further testified he was unaware of any surveillance being done on the informant prior to 6:30 p.m. when he came to the police department, but it was "possible." To Wochner's knowledge, the informant was not a drug user.

Detective Frank Knight, Wochner's partner, testified essentially to the same sequence of events following their entry into the tavern. Prior to going to C.J.'s, however, Detective Knight testified on cross-examination that Wochner was waiting for a phone call back from the informant to confirm the fact that the defendant was still at the bar. The trial court denied the defendant's motion to suppress.

The defendant also filed a motion to suppress his statement made to the police after his arrest, and a hearing was held on that motion at which Detective Wochner testified again, stating that he and Detective Knight interviewed the defendant after his arrest at 7:45 p.m. According to Wochner the defendant was given his *Miranda* rights again, stated he understood them, and signed a rights waiver form. He did not appear to be under any stress nor was there anything unusual about his behavior, although he was worried about the charges against him. Wochner testified the defendant asked them if there was "any way that he could work or do something for us to possibly help himself in the case." Wochner replied they could speak to the State's Attorney's office about that, but that he would be charged first and anything "of that nature" would be dealt with at a later time. Wochner observed no unusual physical, psychological or emotional characteristics about the defendant at the time of the interview, and no threats were made against him.

On cross-examination, Wochner testified the defendant indicated to him that he was drinking 7-Up, and that the defendant did not smell of alcohol. Later, Wochner testified he did not ask the defendant if he had been drinking alcohol or whether he had taken any drugs that day. After the defendant signed the waiver form, there was some conversation about the offense before the booking procedures began. At some point during that conversation, the defendant "volunteered his services." Wochner did not specifically recall the defendant asking for a favor in the way of a recognizance bond. He believed they did discuss bond, but told the defendant they could not make any promises about that. As to whether either Wochner or Knight would be in bond court, Wochner said it was normal procedure for someone to be there. He denied the defendant's request for assistance with bond preceded his admission to the offense. Wochner testified he did not include the fact defendant said he had been drinking 7-Up in the tavern in his report of the interview.

The defendant testified on his own behalf, relaying his past problems with narcotics. He also testified to the psychological problems he experienced when locked up, once when he was in the Marine Corps for narcotics' use, and again in Kane County jail. Following his pre-

vious periods of being locked up, he had ended up in the hospital.

The defendant stated that he had consumed approximately seven beers, eight to 10 mixed drinks, four Quaaludes and some PCP before his arrest on January 21. He began drinking at noon when he had three or four beers with his lunch, and continued to drink two or three beers every now and then, stopping at different bars. He took two of the Quaaludes when he got up, and a couple more about 4:30 p.m. He took the PCP, also known as "dummy dust," sometime before 4:30. He testified Detective Knight advised him of his rights at C.J.'s, and he was given a printed copy of his rights at the police station, told to read it and to sign it if he understood. He told Wochner he did understand, and he signed the waiver. After the booking procedure, Wochner asked the defendant if he wanted to make a statement. The defendant asked him:

> "[I]f I was to admit that the coat and pills were mine, if I would have a chance at bond call the next morning if one of them or both of them could be there to put in a good word for me to the Judge to at least get me on the street on a recognizance so that I could try and do something, find a job or something."

Wochner told the defendant that he could not promise anything but that either he or Detective Knight would be at the bond hearing the following day.

Defendant testified it was important for him to get out of jail because he was scared. Based on his two previous experiences being locked up while he was in the Marines and in the Kane County jail, he was afraid something might happen to him because he had ended up in the hospital in both of those instances of incarceration. He testified he decided to talk to the police:

> "Because they told me that—well, Mr. Wochner, he told me that one or the other one would be there to at least put in a good word for the Judge, and I thought that would at least give me a chance to get out on the street, so I told them I'd cooperate."

Detective Wochner appeared at the bond hearing, and the defendant testified he received a $10,000 recognizance bond.

Jack Crook, a psychiatric social worker who had been seeing the defendant for the previous three months, testified that the defendant suffered from an anxiety or panic disorder and the threat of confinement could produce a terror-like anxiety. In the witness' opinion, suicidal behavior could be a possible reaction by the defendant to the threat of incarceration.

On cross-examination, Crook testified a panic disorder is not a psychosis or neurosis, but a category of an anxiety stage. He testified the defendant's fear of incarceration could result in him not being cognizant enough to make rational decisions.

The court then ordered that Frank Knight must testify because he was a material witness to the defendant's statement. Detective Knight testified that the defendant was told his rights at the time of his arrest, and also at the police station. According to Knight, the defendant admitted that the coat in question belonged to him before asking if there was anything he could do to get out of the trouble he was in. Knight said the defendant did not receive promises or threats during the interview. He also testified that the defendant had said that he had only been drinking 7-Up in the tavern.

On cross-examination, he acknowledged that neither he nor Wochner had included this information in their reports. Based on defendant's demeanor and conduct while in his presence, Knight testified the defendant "appeared to be very straight." Knight stated that the defendant was very concerned about his prospects for release on bond. He did not recall the defendant stating that he was willing to talk, but he knew that the defendant knew he had a right to remain silent, so Knight assumed that he was willing to talk. The defendant was asked about the coat and he denied ownership. He was then shown the Elgin police department document found in the pocket of the jacket, and he said, "Yeah, well, it's my coat."

The court then denied the defendant's motion to suppress regarding any statements made after his rights were read to him.

On January 3, 1984, during a status call on the present case, the court was told that the defendant was admitted to Elgin Mental Health Center due to a suicide attempt.

On the day of trial, February 6, 1984, the defendant moved to exclude several items of evidence. His motion *in limine* to exclude his 10-year-old theft conviction was denied. The court granted his motion to exclude testimony characterizing the nature of the paper found in the defendant's jacket pocket.

In its opening statement at trial, the State referred to the paper found in the defendant's jacket pocket as a "court document." The defendant's objection was sustained.

Batavia police detective Robert Wochner testified for the State. Wochner stated that an informant came to the station to tell him that he had seen the defendant with illegal drugs at a nearby tavern. On cross-examination, Wochner acknowledged that there was no reference in his police report to the meeting with the informant, the in-

formant's sex or reliability. He acknowledged that, at the preliminary hearing, he had testified that he received the informant's tip in a telephone conversation which was not recorded, and that he did not recognize the caller's voice.

Wochner said he and his partner then went to the tavern and asked the defendant if they could talk with him. After the defendant picked up a blue jacket, which another patron in the tavern said belonged to him, he denied owning the jacket which had been described to the officers by the informant. In the jacket pocket, the officers found a paper containing the defendant's name and in another pocket a baggie containing approximately 60 tablets.

According to Wochner, the defendant was informed of and stated he understood his rights, and signed a rights waiver form. Wochner and his partner, Frank Knight, interviewed the defendant who first denied ownership of the jacket containing the tablets. He admitted ownership, however, when he was shown the paper found in the pocket contained his name. The witness' reference to the paper as a "court document" was objected to by the defendant, and the court instructed the jury to disregard the characterization of the paper.

Wochner testified the defendant told them that he had received 100 tablets from an unnamed person the week before. He said he had been in the bar since 4 p.m. that day and had sold a few of the tablets for $3 each. The defendant, Wochner said, wrote and signed the statement approximately one-half hour after his arrest. He testified that the tablets found in the defendant's jacket pocket weighed 45 grams. His report indicated that they weighed 50 grams. Neither Wochner nor Knight stayed at the tavern to interview any of the other patrons after the defendant's arrest.

Detective Frank Knight also testified for the State, repeating the course of events which took place at the tavern. He also referred to the paper found in the defendant's coat as a "legal document." The defendant's objection to this reference was overruled. Knight then testified to the sequence of events which occurred at the police station. He stated that the defendant did not appear to be intoxicated and he made a written statement, admitting ownership of the tablets found. A forensic chemist then testified that the tablets found weighed a total of 45.8 grams, with the scale having an accuracy of within 0.10 grams. The tablets contained methaqualone.

The defendant then testified on his own behalf. He was 29 years old and had used narcotics at periodic intervals since he was 14 years old. He was discharged from the Marine Corps because of narcotics use, and had attempted suicide in 1973. At the time of his arrest for

the present charges, he had been unemployed for eight months and was living in his truck. He was depressed, and wanted to commit suicide at that time. He testified to his suicide attempt which occurred after his arrest and two days before Christmas 1983.

About 1½ weeks before his arrest, he testified that he received the methaqualone tablets from someone who owed him $300 but could not pay him the money because he had recently been released from prison. He said he lied to the police when he told them the drugs had been "fronted" from a friend. The defendant said he normally used between three and five Quaaludes every day. On January 21, 1983, the day of his arrest, he testified he took three Quaaludes, seven beers and seven to 10 mixed drinks. He disputed the contention of the State witnesses that he was in a normal condition; he stated he may have seemed to anybody to be under control, but in reality, he was not. He testified that he gave two Quaaludes to an acquaintance in the tavern who asked for them, and he also acknowledged that he had sold a few. He said he cooperated with the police officers because he was frightened of going to jail and thought the only chance he had was to talk to them and be cooperative. He testified he asked them if he did admit to it, if he did say the jacket was his, what his chances would be of them getting him out on the street. He stated they said they could not make any promises, but that one of them would be in bond court the next morning.

On cross-examination, the defendant testified he had a high tolerance for alcohol and drugs so that he could take a lot of those substances and not appear to be under their influence. He said he really did not know whether he understood that he did not have to talk to the police; he only knew he had to say whatever he could to get out of jail. He admitted he lied to the police about how he acquired the drugs, but that he told them the truth when he said he sold a few, and played pool at C.J.'s beginning at 4 p.m. He never mentioned to the police he wanted to commit suicide. The defendant's 10-year-old theft conviction was then admitted into evidence. As noted, the jury found the defendant guilty of possession of more than 30 grams of a controlled substance, but not guilty of possession with the intent to deliver.

## SUPPRESSION OF EVIDENCE

The defendant first asserts the police search of his coat prior to his arrest was illegal because it was without probable cause and, therefore, it was error for the court to deny his motion to suppress the evidence seized as a result of the search.

The defendant claims that where the reliability and basis of knowledge for the unnamed informant's tip was not shown, and the tip itself was too general to allow for anything but meaningless corroboration, probable cause to search the coat has not been established, and evidence seized thusly must be suppressed. Acknowledging that the "totality of the circumstances" test for the existence of probable cause reaffirmed in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, has supplanted the rigid two-prong *Aguilar-Spinelli* test (*Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509; *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584), defendant argues—correctly so—that the informer's veracity, reliability and basis of knowledge are nevertheless relevant factors in determining the existence of probable cause. He additionally notes that the *Gates* test has also been applied to uphold a *warrantless* search conducted on the basis of a tip from a known informer in *People v. Tisler* (1984), 103 Ill. 2d 226, and distinguishes it from the facts of the instant case. He cites *People v. Loveless* (1980), 80 Ill. App. 3d 1052, a case factually very similar to the instant cause but pre-*Gates*, and the post-*Gates* case of *People v. Moraca* (1984), 124 Ill. App. 3d 561, as two instances in which anonymous tips were found to have been virtually uncorroborated and insufficient to establish probable cause.

■ The State argues the cases cited by the defendant are inapplicable, contending the defendant's denial of ownership of the coat constituted an abandonment of it. When property is abandoned, the State argues, the individual no longer has a reasonable expectation of privacy in it, and such property is no longer protected by the fourth amendment and may be searched without a warrant. (*People v. Jones* (1967), 38 Ill. 2d 427.) Further, the State notes that where the defendant disclaims through words or acts a possessory interest in the property searched, the courts have uniformly held such property to be abandoned and the defendant lacks standing to contest the reasonableness of the search. (See, *e.g., People v. Slawek* (1981), 98 Ill. App. 3d 1146.) We agree with the State's position that the defendant has no standing to contest the reasonableness of the search in light of his abandonment of the coat.

The defendant cites two out-of-State cases in support of his position that his mere denial of ownership of the coat cannot be considered either proof of abandonment, or a valid abandonment for fourth amendment purposes, since it was made under circumstances in which it appeared police detention was imminent: *People v. Cameron* (1973), 73 Misc. 2d 790, 342 N.Y.S.2d 733, and *State v. Chopin* (La. 1979),

372 So. 2d 1222. There is ample Illinois authority to the contrary, which supports the State's contention that the defendant's actions constituted an abandonment of the coat.

For example, in *People v. Brasfield* (1963), 28 Ill. 2d 518, a police officer testified that prior to the defendant's arrest there, he and other officers arranged for an informant to buy drugs from him. The informant reported that he had contacted the defendant, and that he had narcotics on his person, but that he refused to sell any to the informant. The officers then drove to a location where they observed the defendant talking with another person. When three of the officers got out of their car and approached him, the defendant was observed flipping a package over his head. An officer retrieved the package, it was field-tested and found to contain narcotics, and the defendant was placed under arrest. Noting that the defendant had conceded there was no search, the court rejected the defendant's argument that property obtained as a result of an illegal arrest, without a search, is inadmissible. The court considered the fact that the defendant was not arrested until after he had thrown the package, and that under similar circumstances, it had been held that property abandoned by a defendant fleeing from approaching officers is properly seized and admitted in evidence. *People v. Brasfield* (1963), 28 Ill. 2d 518, 520; see also *People v. Slawek* (1981), 98 Ill. App. 3d 1146.

The defendant's unequivocal denial of ownership of the coat, combined with his immediately prior thwarted attempt to put on someone else's jacket as though it were his own, evidenced his clear intent to disclaim any interest in the coat, and it must be viewed as abandoned property in which he had no expectation of privacy whatever. (See also *People v. Pacini* (1980), 85 Ill. App. 3d 1076; *People v. Phoenix* (1981), 96 Ill. App. 3d 557.) Because the protection against unreasonable search and seizure does not extend to abandoned property, such property may be seized without probable cause (*People v. Hoskins* (1984), 101 Ill. 2d 209, 220), and may be admitted against the defendant. Accordingly, the trial court's judgment denying the defendant's motion to suppress the evidence was correct.

Because of our determination of this question, it is unnecessary to consider the issue of probable cause for the search under *Gates*.

### Motion *In Limine*

■ Defendant next contends he was denied a fair trial when the prosecutor in opening argument and two State witnesses at trial referred to the paper found in the defendant's coat pocket as a "court document" and a "legal document." He argues the references were

blatant violations of the court's explicit ruling that the paper was to be referred to as nothing more than a "document" or "paper." He further argues the references were error which were not cured by the sustaining of his objections, or by the court's instruction to the jury to disregard the comments.

The State disputes that the record shows any blatant violations or disregard for the court's ruling on defendant's motion *in limine*. Acknowledging the remarks were error, the State nonetheless argues they did not amount to reversible error in light of the other evidence of defendant's guilt. In this regard, the State points out the defendant's objections to the remarks were sustained, and the jury was admonished to disregard them. The State additionally contends the terms "court document" and "legal document" are so general and obscure that the mere mention of them would not constitute reference to other crimes.

Based on a review of the challenged terminology in the context of the record, we believe the State's conduct and that of its witnesses, although not blatantly disregardful of the court's ruling, evidences a reprehensible circumvention of the spirit of the court's ruling by resorting to a hypertechnical construction of it.

The court's comments in ruling on the motion *in limine* imparted both a general and a specific prohibition against references to the nature of the document; to-wit:

"THE COURT: You can testify the documents were found which indicated the identification, but not anything else those documents said. I won't let you say what those documents were. Just on the documents was his name.

MR. FILIPPO [Assistant State's Attorney]: Okay. All right. I will instruct—

THE COURT: We will not go into the fact that it was an arrest ticket or a charge.

MR. FILIPLPO: I have no problem with that.

THE COURT: Let's go on.

MR. LOREK [Defense attorney]: If I can conclude [*sic*] at the preliminary hearing, he just testified that I found a paper with Mike Hanlon's name on it.

THE COURT: Or a document. I don't care what words they use. A paper.

All right. Go ahead."

Although the prosecutor's reference on opening argument to finding a "court document" did not violate the specific prohibition against calling the document an arrest ticket or charge, it clearly avoided the

general prohibition against conveying to the jury the nature of the document by prefacing the neutral noun "document" with the loaded adjective "court." Further, although the prosecutor personally did not use the term after being admonished by the court, Detective Wochner's subsequent unsolicited identical description of the piece of paper found in the top pocket of the defendant's jacket as the one "which was the court document that had his [the defendant's] name on it," suggests an ulterior intent to create suspicion in the minds of the jurors as to the nature of the document. As the defendant points out in distinguishing *People v. Campbell* (1984), 126 Ill. App. 3d 1028, the witness here *was* a police officer and, unlike the lay witnesses in *Campbell*, would be expected to be more familiar with the possible harmful effect of making a reference to finding a "court document."

It is true, as defendant contends, that it is improper to refer to evidence which has been excluded. (*People v. Burton* (1978), 63 Ill. App. 3d 915, 919; *People v. Hovanec* (1976), 40 Ill. App. 3d 15.) The excluded evidence in the case at bar was not an admission of the crime in question as was the case in *People v. Pughsley* (1966), 73 Ill. App. 2d 442, cited by the defendant here, and the prosecutor's comments did not intimate that excluded evidence favorable to the State was being hidden from the jury, as was the case in *Burton* and *Hovanec*. The testimonial reference to find a "court document" in the defendant's jacket pocket did not provide any direct evidence of a prior offense, although it did permit the inference to be drawn that there was some prior offense. Nevertheless, considering the document was being carried in the defendant's jacket pocket, it is most likely that the jury would have surmised that it was a traffic ticket, which indeed it was, as opposed to a copy of an indictment or information. This view comports with the court's recent decision in *People v. Campbell* (1984), 126 Ill. App. 3d 1028, where three witnesses referred to identification of the defendant through use of "mug" or "mug shot" books. The court determined there that such reference did not warrant reversal or a new trial where the jurors could not have failed to know the nature of the book no matter what it was called. Moreover, the court in *Campbell* considered the subject of the mug books was not a superfluous element; it was material to the identification of the defendant. Similarly here, the finding of the court document with the defendant's name on it was material to the issue of ownership of the jacket and, indirectly, to the issue of the defendant's guilt or innocence since he initially denied ownership, an act which in these circumstances may be viewed as a consciousness of guilt. In contrast to *Campbell*, it does not appear here that there was

an opportunity for the prosecutor to relay the court's clarification of its ruling *in limine* to the detectives prior to their testimony.

Defendant's objections were sustained and the jury admonished to disregard the remarks. Such salutary measures have been held sufficient to "cure" any prejudice (*People v. Baptist* (1979), 76 Ill. 2d 19, 30), and improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused, and each case of this kind must be decided on its own facts. (76 Ill. 2d 19, 29.) The error here was not so unduly repeated as to have caused the defendant substantial prejudice.

The two references to the "court document" were sufficiently separate so as to negate any "cumulative" impact which may have prejudiced the jury and constituted a material factor leading to the defendant's conviction. *Cf. People v. Whitlow* (1982), 89 Ill. 2d 322, 340-42 (where the cumulative impact of improper comments made by the prosecutor about the defendants' past criminal activity after defendants' motion *in limine* had been granted was held to entitle them to a new trial).

We conclude it is unlikely the two references to the "court document" were a material factor in the jury's verdict or that it would have been different had the offensive terms not been used. Consequently, the error was harmless. *People v. Campbell* (1984), 126 Ill. App. 3d 1028, 1050; *People v. Warmack* (1980), 83 Ill. 2d 112, 128-29.

With regard to Detective Knight's reference to a "legal document" being found in the defendant's pocket, defendant's objection to the term was overruled, correctly so, we believe. The term "legal document," we believe, has a much broader connotation than does the term "court document" and could, as the State argues, have suggested to the jury that the document was any number of nonprejudicial items such as a will, divorce papers, a subpoena, or jury summons. This term was simply too general to even have suggested that there may have been a prior offense. Moreover, this particular error was not specified in the defendant's post-trial motion, and the defendant has waived any error in the use of the term "legal document." The defendant was not denied a fair trial as a result of these remarks.

SUPPRESSION OF STATEMENT

■ Defendant next contends it was error for the court to deny his motion to suppress his statement because there was ample evidence presented at the hearing to prove that his statement was not voluntary. Pointing out that it is the State which bears the heavy bur-

den of proving that the defendant's confession was made knowingly, intelligently, and voluntarily, without compulsion or inducement of any sort (*People v. Kincaid* (1981), 87 Ill. 2d 107; *People v. Young* (1983), 115 Ill. App. 3d 455), the defendant asserts an examination of the totality of the circumstances which attended the making of his statement, in conjunction with his own particular characteristics, shows the State did not meet its burden. Specifically, the defendant argues his anxiety disorder, combined with his drug and alcohol-influenced physiological condition, made him particularly vulnerable to any offer of bond assistance by the police.

Based on a review of the record, we do not agree that the totality of the circumstances shows the defendant's statement was involuntary.

When an objection is made to the admission of a confession on the ground that it was involuntary, the burden of going forward with the evidence and proving that the confession was voluntary is on the State. (Ill. Rev. Stat. 1983, ch. 38, par. 114—11(d).) The proof required is by "a preponderance of the evidence." (*Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 627; *People v. Harper* (1967), 36 Ill. 2d 398.) "Preponderance of the evidence" means the greater weight of the evidence, not necessarily in numbers of witnesses, but in merit and worth that which has more evidence for it than against it is said to be proved by a preponderance; a preponderance of evidence is sufficient if it inclines an impartial and reasonable mind to one side of an issue rather than the other. *Moss-American, Inc. v. Fair Employment Practices Com.* (1974), 22 Ill. App. 3d 248, 259; *People v. Drake* (1985), 131 Ill. App. 3d 466, 472.

■ The determination of the issue of voluntariness of a confession depends not upon any single factor, but on the totality of the particular circumstances in any given case. (*People v. Barber* (1983), 116 Ill. App. 3d 767, 775; *People v. Mitchell* (1981), 98 Ill. App. 3d 398.) The question of whether the defendant's will was overcome at the time he confessed or whether the confession was made freely, voluntarily and without compulsion or inducement of any sort, is for the trial court. (*People v. Noe* (1980), 86 Ill. App. 3d 762.) If the trial court finds the confession is voluntary and has applied the proper legal standard, on review, the inquiry is limited to whether the court's finding is against the manifest weight of the evidence. (*People v. Davis* (1983), 97 Ill. 2d 1, 20; *People v. Dixon* (1982), 105 Ill. App. 3d 340.) If the court's finding is not against the manifest weight, the appellate court has the duty to affirm the judgment. (*People v. Fox* (1981), 97 Ill. App. 3d 58.) In passing on a ruling by the trial court on

a motion to suppress, a reviewing court may consider the entire record, including additional testimony received at trial. *People v. Caballero* (1984), 102 Ill. 2d 23, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362; *People v. La Bostrie* (1958), 14 Ill. 2d 617.

One's free choice to admit, deny, or refuse to answer may be overcome by the effect of drugs (*People v. Koesterer* (1976), 44 Ill. App. 3d 468), intoxication can render a waiver of rights ineffective (*People v. Fuller* (1980), 91 Ill. App., 3d 922), and statements given when emotionally upset may be involuntary (*People v. Rhoads* (1979), 73 Ill. App. 3d 288). An offer of leniency is a factor to be considered in determining the voluntariness of a confession (*People v. Makes* (1981), 103 Ill. App. 3d 232), and statements given in consideration of promises of leniency or immunity are rendered involuntary, and therefore, inadmissible (*People v. Slaughter* (1978), 59 Ill. App. 3d 159; *People v. McCue* (1977), 48 Ill. App. 3d 41).

Even accepting as true the defendant's version of the making of his statement, which the court is not required to believe (*People v. Davis* (1983), 95 Ill. 2d 1, 25, *cert. denied* (1983), 464 U.S. 1001, 78 L. Ed. 2d 697, 104 S. Ct. 507), his own testimony shows his statement was voluntary, and that his will was not overcome by his mental condition, drugs, intoxication, or by promises of leniency.

The defendant, age 29, testified at the suppression hearing on December 8, 1983, that when he was about 18 or 19 years old, he was incarcerated in the brig in the Marine Corps due to his drug problems. While he was in the brig, he had "some type of collapse," but he could not recall much of that experience. Later, in 1974 for 2½ weeks, and in 1975 for a couple of days, he was admitted to the Elgin Mental Health Center. With regard to the first such admission, he testified he had been put in the Kane County jail and all he knew that people told him that he "started going kind of crazy and they took [him] to the hospital." He did not testify concerning the second admission to the Elgin Mental Health Center. He further testified at the hearing that on the morning in question, he took two Quaaludes when he arose; they made him get kind of slow, kind of "relaxed." He had three or four glasses of beer with his lunch at C.J.'s tavern about noon, and had two or three beers every now and then as he was walking around stopping at different bars during the remainder of the afternoon. He had $20 or $30 worth of PCP, "dummy dust," a little while before he returned to C.J.'s about 4:30 p.m., at which time he took two more Quaaludes. When he was asked what kind of reaction the PCP caused, the defendant testified "[i]t sort of makes you stupid, I guess." Between 4:30 and 7:30, he testified he had eight or 10

"7-7's" (Seagram's Seven and 7-Up). Defendant admitted on cross-examination that he did not tell the police, nor did they ask, about his use of drugs or alcohol on the day in question. He said the Quaaludes have a relaxing effect on him and make him less nervous. He testified he was not forced into signing the waiver, he recognized the statement that he wrote out while he was at the police station, and he stated that he voluntarily gave the statement to the police. At trial, the defendant testified he had a high tolerance for alcohol and drugs and could take a lot of substances and not appear to be under the influence.

The defendant testified at the suppression hearing that he was advised of his rights at C.J.'s and, again later, at the police station was given a printed copy of his *Miranda* rights, told to read them, and to sign it if he understood it. He told the police he understood his rights, and signed the paper. He testified he was then booked and that Detective Wochner then said: "We should talk about what happened." The defendant testified that it was at that point that he asked Wochner:

"[I]f I was to admit that the coat and the pills were mine, if I would have a chance at bond call the next morning if one of them or both of them could be there to put in a good word for me to the Judge to at least get me out on the street on a recognizance so that I could try and do something, find a job or something.

Q. [Defense counsel]: Okay.
Well, what did the police officers respond to your question?

A. They said that they couldn't promise anything, but that one of them would be there.

Q. Okay.
And did you ask them anything else about bond at that time, or —

A. Just—I was just mostly concerned I would have somebody to talk to them for me. I didn't think it would do much good, anything I had to say."

The defendant testified that it was important for him to get out of jail because he was scared that something might happen to him like the two other times when he was in the Marines and in the Kane County jail and ended up in the hospital. He testified that he had decided to talk to the police because he thought that way he would at least have a chance to get on the street; he "just wanted to cooperate. [H]e didn't want to do anything wrong or to make them mad or anything." He testified the conversation with the detective about bond was before he gave any admission.

The only contrary testimony given by Detectives Knight and Wochner was that the defendant admitted the coat was his before any discussion about bond occurred. Detective Knight testified the defendant first denied the coat was his, was then shown the Elgin DUI with his name on it which was taken from the coat pocket, and that he then admitted the coat was his. Both officers testified the defendant told them he was drinking 7-Up at the bar, and that he did not appear to be under any stress other than being worried about the charges against him. There was nothing unusual in his appearance or behavior, and nothing about him either physically, psychologically, or emotionally seemed unusual.

A psychiatric social worker from the Ecker Center for Mental Health in Elgin, Jack Crook, testified on behalf of the defendant at the suppression hearing. He testified the defendant had been referred to him from the Elgin Mental Health Center and that the defendant had been seen on a weekly basis, with two exceptions, since September 7, 1983. The defendant complained of anxieties, sleeplessness, weight loss, nightmares, and a variety of other symptoms which were indicative of a general category of anxiety disorder. At Crook's request, the defendant was evaluated by Doctor Costa, a psychiatrist with the Ecker Center; Doctor Costa's evaluation corroborated Crook's own observations of the defendant. Crook testified that in certain situations, even implied ones, the defendant would feel an overwhelming, terror-like fear, which was stronger than anxiety. Crook testified two situations which could cause the defendant to feel this way were the threat of incarceration and a situation which would involve the loss of his girlfriend. Crook testified that in such instances, the defendant would not be cognizant enough to make rational decisions; the reaction to his own emotion would supercede judgment or cognitive approach to matter.

The totality of the circumstances clearly establishes the defendant's statement was made voluntarily, and that the trial court's judgment was not against the manifest weight of the evidence. Notwithstanding that the most recent of the two instances of incarceration which resulted in his hospitalization occurred almost 10 years prior, it is significant that it was actually the defendant who initiated the terms of the "promise" which defendant alleges induced the statement. Viewed objectively, this fact indicates the defendant was capable of a cognitive approach to the matter, *i.e.,* an approach which indicates he perceived what was going on. It showed further that his ability to make a rational judgment was not superseded by his "terror-like" fear of incarceration. He simply realized he was in serious

trouble, and he was seeking to minimize the extent of the jeopardy. He admitted he could tolerate drugs and alcohol better than most people, and the usual effect of those substances could not readily be discerned on him by observers. There is no evidence he was confused about what was happening, or did not understand what was going on as a result of his ingestion of these substances.

Moreover, the record shows the police made no promise which might have induced his statement. At most, Detective Wochner stated one of them would be present at bond court in the morning, which he testified was the usual practice. Neither detective promised to "go to bat" for the defendant on the matter of a recognizance bond, as was the case in *People v. Ruegger* (1975), 32 Ill. App. 3d 765, nor was there any indication of a promise that a recognizance bond would not be opposed as in *People v. Koesterer* (1976), 44 Ill. App. 3d 468, nor was there even as much as a promise to recommend a "low bond," as was the case in *People v. Sellars* (1981), 93 Ill. App. 3d 744, and in *People v. Carroll* (1977), 50 Ill. App. 3d 946. There is no report of the bond court proceedings included in the record, and it is not known whether Detective Wochner was even called upon to speak. The record does reflect the defendant was granted a $15,000 recognizance bond. The defendant also testified himself that he wanted to cooperate with the police, and that he voluntarily gave them his statement.

In sum, the trial court did not err in refusing to suppress his statement.

## RESENTENCING

■ In his last argument here, the defendant urges that the cause be remanded for a new sentencing hearing. He contends this should be done because probation became a possible disposition for the offense of which he was convicted "shortly after" he received the then-mandatory minimum sentence of four years imprisonment. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3(c)(2)(D); Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3(c)(2)(D); Ill. Rev. Stat. 1981, ch. 56½, par. 1402(a)(9).) He further argues for remand even if he does not have an absolute right to same, because neither the State nor the court showed "any strong inclination" in favor of imprisonment, and because defense counsel argued seven factors in mitigation as opposed to the State's argument in aggravation pointing only to his prior 10- and 11-year-old convictions for theft and cannabis violations. In support of his argument, he cites *People v. Carleton* (1969), 116 Ill. App. 2d 450.

In response, the State argues the general rule that a reviewing court will not disturb a sentence unless it greatly diverges from the

spirit and purpose of the law or is highly disproportionate to the nature of the offense, citing *People v. Nelson* (1982), 106 Ill. App. 3d 838. It points out the defendant received the statutory minimum sentence and, further, even if probation had been available, the State contends that where the defendant's past history and character could not have been viewed as presenting an attractive picture of eligibility for probation at the original sentencing, it could not be viewed any differently several months subsequent thereto simply because the offense became a probationable one in the interim.

Notably, neither party states exactly when the statute in question was amended. It was, in fact, amended by Public Act No. 83—655 on September 23, 1983, and became effective January 1, 1984. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3(c)(2)(D).) That date was fully three months prior to defendant's March 15, 1984, sentencing hearing. Public Act No. 83—655 deleted a violation of subsection 402(a) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1983, ch. 56½, par. 1402(a)) from the list of offenses in section 5—5—3 of the Unified Code of Corrections (the Code) for which neither a period of probation, nor a term of periodic imprisonment nor conditional discharge could be imposed. Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3(c)(2)(D).

Section 8—2—4(b) of the Code provides that a defendant has the right to elect to be sentenced under the law in effect at the time of the offense or under the statute in effect on the date of sentencing. (Ill. Rev. Stat. 1983, ch. 38, par. 1008—2—4(b); *People v. Einstein* (1982), 106 Ill. App. 3d 526, 535.) Because it is the burden of counsel to explain the sentencing laws and to suggest to the defendant what appears to be the best choice (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 930), all that is required of the trial court is to inform the accused of the right to make an election. (*People v. Einstein* (1982), 106 Ill. App. 3d 526, 535; *People v. Finley* (1980), 82 Ill. App. 3d 307, 309-10.) Where the sentencing alternatives available at the time of sentencing differ from those available at the time of the offense, the defendant is entitled to be informed that the two sentencing schemes exist, and to be offered his choice of under which one sentence should be imposed. (*People v. Smith* (1984), 127 Ill. App. 3d 622, 635; *People v. Fuller* (1980), 91 Ill. App. 3d 922, 930.) A defendant who has not been informed of the existence of sentencing alternatives has not been afforded his statutory right to elect. In such cases defendant's sentence properly is vacated, and the cause remanded for resentencing. *People v. Smith* (1984), 127 Ill. App. 3d 622, 635.

The record below shows the defendant was not informed of the existence of sentencing alternatives, nor was probation considered to

be a possible disposition. Accordingly, his sentence must be vacated and the cause remanded for resentencing.

The judgment of the circuit court of Kane County finding the defendant guilty of possession of a controlled substance is affirmed. The defendant's sentence is vacated, and the cause remanded for resentencing so that probation may be considered as a possible disposition.

Affirmed in part; sentence vacated; cause remanded.

NASH, P.J., and STROUSE, J., concur.